UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JOHN H. WHITE,

                                Petitioner,

        -against-


DAVID ROCK, Superintendent of the
Upstate Correctional Facility,

                                Respondent.
------------------------------------------------------- X

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D N Y

★    APR 22 2013    ★

LONG ISLAND OFFICE

OPINION & ORDER
CV-10-5163 (SJF)

FEUERSTEIN, J.

I.      Introduction

        On June 6, 2008, a judgment of conviction was entered against petitioner John H. White

("petitioner") in the Supreme Court of the State of New York, Nassau County (Brown, J.) ("the

trial court"), upon a jury verdict finding him guilty of murder in the second degree (N.Y. Penal

Law § 125.25(3)), attempted robbery in the first degree (N.Y. Penal Law §§ 110.00 and

160.15(2)) and attempted robbery in the second degree (N.Y. Penal Law §§ 110.00 and

160.10(1))[1], and imposition of sentence. On November 5, 2010, petitioner filed a petition in this

Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth

below, the petition is denied.

---

[1] The jury acquitted petitioner of the charges of criminal possession of a weapon in the
second degree (N.Y. Penal Law § 265.03(2)) and criminal possession of a weapon in the third
degree (N.Y. Penal Law § 265.02(4)). In addition, on the prosecution's motion, the trial court
dismissed the charge of criminal possession of a controlled substance (N.Y. Penal Law §
120.06(5)) (S. 2).

II.   Background

    A.   Factual Background

        1.   The <u>Wade/Huntley</u> Hearing

On June 13-15, 18, 20-21, 25-26 and 29 and July 16, 2007, a hearing pursuant to <u>United States v. Wade</u>, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) and <u>People v. Huntley</u>, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), was held before the trial court on petitioner's omnibus motion to suppress to determine the suggestiveness of an identification procedure and the voluntariness of petitioner's statements to law enforcement officers, respectively. At the hearing, Detectives Carl Re ("Re") and Edward Hoctor ("Hoctor") testified on behalf of the prosecution and Detectives Darryl Aiken ("Aiken") and Dean Nicosia ("Nicosia") were called to testify by the defense. The following testimony was given[2]:

Re testified that on October 22, 2005, at approximately 9:50 a.m., his supervisor called him into work to investigate the murder of Jose Benitez ("Benitez") at an apartment complex on Hendrickson Avenue in the Village of Hempstead, New York. (H. 26-7; H2. 18, 23). According to Re, he spoke with Benitez's cousin, Caesar Jiminez ("Jiminez"), who told him that he, Benitez and two (2) other cousins, Jose Rosales ("Rosales") and Julio Benitez ("Julio"), were drinking in a vehicle parked in the rear parking lot of 60 Hendrickson Avenue since midnight; that at approximately 6:00 a.m., he gave Benitez twenty dollars ($20.00) and Benitez went to a nearby Stop and Shop store, located on the corner of Fulton Street and Hendrickson Avenue, to purchase more beer; that when Benitez had been gone for approximately ten (10) minutes, he heard a

---

[2] References to the transcript of the proceedings on June 13, 2007 are cited as "(H.)" and references to the transcript of the remaining hearing proceedings are cited as "(H2.)."

gunshot; that he then got out of the vehicle and saw Benitez staggering towards him still holding the beer that he had purchased and being chased by two (2) males, whom he described as "possibly male blacks," approximately the height of the six foot (6') fence and of medium build, dressed in dark clothing with the hoods up; and that he then heard two (2) more shots and saw the two (2) males who had been chasing Benitez turn and flee westbound on the walkway heading toward Hendrickson Avenue, then turn right to head north on Hendrickson Avenue. (H. 27-8; H2. 33-4, 47).

Re testified that a single bullet was recovered from Benitez's body, specifically from his chest. (H. 29).

Re testified that the building at 60 Hendrickson Avenue was canvassed for witnesses. (H2. 40). Jose Palacios ("Palacios"), in apartment 2A, told him that shortly after 6:00 a.m., he heard three (3) shots and that when he looked out his window, he saw a black male, almost as tall as the fence line, dressed in all black and wearing a hoodie, run out of the apartment complex onto Hendrickson Avenue, stoop down to pick something up at the fence, then walk northbound on Hendrickson Avenue. (H2. 41).

On October 23, 2005, Re spoke with April Jones ("April") and her mother Bernice Jones ("Bernice"). (H2. 49-51). April told him that she heard two (2) to three (3) shots and a male voice yelling "ow," but she did not look out the window. (H2. 51). Bernice told him that after she heard three (3) shots, she looked out the window and saw a male wearing a dark hoodie walk with a slight limp alongside the fence of 60 Hendrickson Avenue, then he turned and walked northbound on Hendrickson Avenue. (H2. 51). Bernice only indicated that she saw one (1) person. (H2. 52).

3

Re testified that on April 16, 2006, he was notified by Lieutenant Farrell ("Farrell") that the Hempstead Police Department had Keith James ("James") in custody for his involvement in a shooting that had occurred earlier that date and that when James "gave up the gun that was used in that shooting [on April 16, 2006]," which had been secreted in the boiler of James's house, he indicated that he had information about Benitez's homicide. (H. 29-30; H2. 102-04). According to Re, when he subsequently spoke with James, James told him that he knew petitioner for several years prior to October 22, 2005; that on October 21, 2005, petitioner had borrowed a .32 caliber Taurus revolver from him; that on October 22, 2005, at approximately 6:00 a.m., he and petitioner drove to the Stop and Shop on the corner of Fulton Street and Hendrickson Avenue in James's mother's vehicle; that when they pulled into the lot of the Stop and Shop, the clerk, Syed Raza ("Raza"), emerged and entered into a conversation with him; that shortly thereafter, petitioner exited the vehicle, stood on the sidewalk, watched patrons exiting the store, motioned to James with a nod of his head, then headed southbound on Hendrickson Avenue; that he continued his conversation with Raza for a short time, then he drove around the block onto Devon Road to pick up petitioner; that when he stopped at the corner, he saw petitioner first walk, then run towards his car; that after petitioner got into the car and they started to drive away, petitioner showed him three (3) spent rounds and said: "I just shot a papi[3], I tried to rob a papi, [t]he papi put up a struggle with a case of beer and I shot at him three times;" that petitioner initially held the bullets in one hand and the gun in the other hand, but then he put the bullets back in the gun; that James drove to his house, where he "secured the weapon," then he dropped petitioner off; and that a couple of days later, petitioner told him that the "papi" had died. (H.

[3] "Papi" or, alternatively, "poppy," is apparently a slang reference to an Hispanic male.

4

30-1; H2. 121, 142-9, 161, 164-65).

Following his interview with James, Re requested that the forensic firearms section of the Nassau County Police Department ("NCPD") test the gun that had been recovered from James's residence on April 16, 2006 and compare it to the slug that had been recovered from Benitez's body. (H. 31-2). On that same date, Detective Sergeant Robert Nemeth ("Nemeth") notified Re that he had compared the bullet that had been recovered from Benitez's body to the .32 caliber revolver that had been recovered from James's resident and "it was a match." (H. 32; H2. 165-66).

On April 20 or 21, 2006, Re notified Nicosia, of the Hempstead Village Police Department, of the forensic test results and that there was a pending warrant for petitioner's arrest for two (2) marijuana charges that had been issued a couple of weeks earlier, and requested that he arrest petitioner if he saw him in Hempstead. (Re: H. 32; H2. 167-70; Nicosia: H2. 371-73). Nicosia testified that on April 21, 2006, at approximately 8:00 a.m., he went in an undercover car to go look for petitioner by checking the areas where he was known to go. (H2. 374-75). Shortly before 2:00 p.m., Nicosia located petitioner leaving the yard area of his mother's residence on 108 Remsen Avenue, walking southbound on the sidewalk on Remsen Avenue and carrying a bag in his hand. (H2. 375-77). Nicosia radioed for back-up, then approached petitioner, who, because he had a history of being an informant for Nicosia, got into the front passenger seat of Nicosia's car without being instructed to do so or handcuffed. (H2. 379-81). Nicosia started "small talk" with petitioner, asking him where he was going, and petitioner showed him that he had shoes in the bag he was carrying and said that he was going to somebody's house. (H2. 380). Nicosia told petitioner that he could take him to the person's

5

house to deliver the shoes, but that he first wanted to speak with petitioner, and asked petitioner if he would go to the Hempstead Police Department headquarters with him. (H2. 380). Nicosia drove petitioner to headquarters, where they went into the basement and entered the building through the back garage door. (Nicosia: H2. 382-83). According to Nicosia, prior to bringing petitioner upstairs at headquarters, he handcuffed him, then he brought petitioner to a cell. (H2. 383-84). Someone from the Hempstead Police Department then called the NCPD and told them that petitioner was in custody in the Village of Hempstead. (Re: H. 33; Nicosia: H2. 385). Nicosia then went into petitioner's cell and searched him. (Nicosia: H2. 385).

At Re's request, petitioner was transported to the homicide squad of the NCPD at approximately 2:15 p.m. on April 21, 2006. (Re: H. 33; H2. 179; Nicosia: H2. 385-89). According to Nicosia, petitioner, who remained handcuffed during the ride, was never told that he was under arrest and there was no discussion with petitioner during the ride, with the exception that he was told that he was being brought to the NCPD because a couple of detectives wanted to speak to him. (H2. 387-88). Nicosia testified that petitioner was brought into a room in the corner of the homicide squad and he had no further contact with him. (H2. 389-91).

Aiken testified that on April 21, 2006, he was called to the homicide squad to relieve other detectives that were there that day and he remained there throughout the night and into the next morning. (H2. 319-20). According to Aiken, when he arrived, and for most of the time he was there, petitioner was inside a room with the door closed. (H2. 321-22). However, Aiken testified that although he did not really go up to the homicide squad often, he "believe[d] you could see into the room" through a window in the door if you walked up to it. (H2. 329-30). Aiken did not see any witnesses in this case enter the homicide squad while he was there. (H2.

6

328).

Re testified that at approximately 2:30 p.m., he came into petitioner's presence and, after obtaining pedigree information, told him that he wanted to speak to him about a shooting that had occurred the week before and a homicide that had occurred in Hempstead the year before, but first he needed to advise him of his constitutional rights. (H. 33-4; H2. 200-02). According to Re, at approximately 2:40 p.m., he read petitioner his constitutional rights from a card used by the NCPD, on which petitioner indicated his waiver of those rights, and which was then signed by himself, Detective DePietro ("DePietro"), who participated in the interview with Re, and petitioner. (H. 34, 36-8; H2. 200).

Re testified that following petitioner's waiver of his constitutional rights, he offered petitioner a soda, then advised him that he needed to speak with him about a shooting that had occurred a week earlier in which James was involved. (H. 40-1; H2. 202-05). Petitioner denied knowledge of the shooting and indicated that he knew James for several years, but stopped "hanging out with him" in October 2005 "because [James] had a gun." (H. 41; H2. 206). Re then discussed DNA with petitioner and told him that since law enforcement officers would be able to tell from DNA if he had ever touched James's gun, petitioner should just tell them if he had ever done so. (H. 41-2, 46-7; H2. 208-11). Petitioner then described a gun that he had seen and touched at James's house in October 2005. (H. 47).

Re testified that at approximately 4:00 p.m., he gave petitioner a fifteen (15) minute break from the interview and provided him with a can of soda. (H. 47; H2. 214). Following the break, Re questioned petitioner first about a robbery committed by petitioner in 1999, then about Benitez's murder. (H. 47; H2. 214-16). According to Re, petitioner denied any knowledge of

7

Benitez's murder and said he was not there, after which Re handed him a Crime Stoppers poster regarding Benitez's death and told him to read it. (H. 47; H2. 216). Re testified that after reading the poster for a couple of minutes, petitioner placed it face down on the table and said: "It says here [Benitez] was robbed." (H. 48; H2. 217). According to Re, when he told petitioner that the poster made no reference to the fact that Benitez had been robbed, petitioner said: "[I]t says here the Puerto Rican papi was robbed." (H. 48). Petitioner then told Re that he had not committed a robbery since he was released from jail in September 2005 and that James cannot commit robberies anymore because he has a rod in his leg and cannot run. (H. 48; H2. 217). According to Re, as a result of a prior leg injury, James walks with a limp. (H2. 217).

Re testified that petitioner told him that on the night of Benitez's homicide, he had been hanging out at "the 590 building" on Fulton Avenue in Hempstead and smoking "weed" by himself when he saw James and Cordell James ("Cordell") drive by in James's two (2)-door white Pontiac and continue down Fulton Street until they made a right onto the street just east of Hendrickson Avenue, then another right into the parking lot of a Taco Bell, which is the same parking lot as the Stop and Shop. (H. 50; H2. 218-19). Petitioner observed James sitting in his vehicle and having a conversation with a male standing outside the vehicle, then Cordell get out of the vehicle and start to walk around the back of the Taco Bell. (H. 51). According to Re, at this point in the interview, he gave petitioner a twenty (20) minute break, during which petitioner was taken to the bathroom. (H. 51; H2. 221-22).

After the break, petitioner changed his story and said that he saw James drive the Pontiac down Hendrickson Avenue. (H. 51; H2. 223). Petitioner then stated that while he remained standing on the corner by "the 590 building," he heard shots, at which time he ran across the

8

street to Warner Avenue, a block west of Hendrickson Avenue on the north side of the street, and hid behind a medical lockbox in front of a medical building on the corner of Warner Avenue and Fulton Avenue, from where he observed James drop Cordell off by the Taco Bell. (H. 51; H2. 223-24).

Re testified that he gave petitioner a third break, for about fifteen (15) minutes, at approximately 7:30 p.m. (H. 52; H2. 225). At 7:45 p.m., Re gave petitioner two (2) slices of pizza and a soda and they took another forty (40) minute break. (H. 52; H2. 225).

Re testified that during the break, at approximately 7:50 p.m., he interviewed and showed two (2) photo arrays to Raza. (H2. 12-13, 235). During Re's interview with Raza, petitioner remained in the interview room located at the back of the squad room, which had a two (2)-way mirror and a window with a closed curtain over it which prevented anyone from seeing inside the room. (Re: H2. 13-4, 195-98; Hoctor: H2. 70-3). Re's interview with Raza took place in a room at the "far end" of the homicide squad from petitioner's interview room. (H2. 13, 290-91).

Raza told Re that he knew James for about ten (10) years and had known his father, (H2. 292-94), and he immediately picked James's photograph out of a photo array shown to him. (H. 292). Re testified that when he showed Raza another photo array and asked him if he recognized anyone in the picture, Raza immediately identified photograph number four (4), a photograph of petitioner, as the person who had been with James at the Stop and Shop on October 22, 2005 shortly after 6:15 a.m. Raza told Re that he knew petitioner because he had been a customer at his store for about seven (7) years, although he had stopped coming into the store for about a year and told Raza that it was because he had been in jail; that he saw petitioner on the morning of Benitez's murder when he left the store between 6:15 and 6:30 a.m.; that after he left the store, he

9

saw James pull into the parking lot in front of the store, so he went over and had a conversation with him; that at some point during his conversation with James, petitioner got out of the car "very abruptly" and proceeded to walk southbound on Hendrickson Avenue; and that he continued talking to James for a couple of more minutes, then James left. (H2. 15-6, 293-94, 297-99). Raza and Re then signed their names under photograph number four (4) of the photo array and Re proceeded to take a statement of identification from Raza. (H2. 17). On cross-examination, Re testified that petitioner was the only subject in the photo array wearing his hair in "corn rows." (H2. 297). According to Re, during his prior conversations with Raza, he never mentioned any particular suspects to him or showed him any photographs. (H2. 288-89).

When Re resumed interviewing petitioner after the pizza break, petitioner told him that he remembered seeing James drive down Hendrickson Avenue and make a left onto Front Street, which is the most southern block on Hendrickson Avenue. (H. 52; H2. 228). When Re questioned how petitioner could see all of that while hiding behind the lockbox, petitioner said: "Well, maybe it wasn't Front Street, maybe it was Devon [Road]* * *." (H. 52; H2. 228). Then petitioner told Re that he saw Cordell run by the brown fence all the way at the end of the block by 60 Hendrickson Avenue, where Benitez was murdered, (H. 52; H2. 229), although he could not recall what Cordell had been wearing. (H. 52; H2. 229). When Re asked petitioner if he saw anybody else in the area, petitioner said: "I didn't see the PR [Puerto Rican]." (H. 52; H2. 229).

Detective Edward Hoctor ("Hoctor") testified that at approximately 8:40 p.m., he watched petitioner in the interview room, with the door closed, for approximately fifteen (15) minutes while Re and DePietro stepped out. (H2. 60-2, 68, 73-4). During a conversation with petitioner, whose demeanor was calm, petitioner told Hoctor that at one point, after he heard a

10

shot, he hid behind some medical lock boxes around the vicinity of the Stop and Shop. (H2. 61, 69, 76).

Re testified that he then prepared a sketch of the general area that petitioner was describing, which he asked petitioner to fill in. (H. 52-6). They then took another break, for about fifteen (15) minutes, (H. 58), following which petitioner told Re that he saw James about two (2) days after Benitez's murder, at which time James told him that Cordell had shot a guy. (H. 59; H2. 238-39). Re then told petitioner that a jury was only going to hear James's version of Benitez's murder and that James was "pointing the finger at [petitioner]." (H. 59; H2. 240). According to Re, petitioner then got "very agitated," pounded on the table and said: "Fuck Keith [James], He was there. We robbed the PR and he said no no, the black guy." (H. 59, H2. 4, 240). When Re questioned petitioner again about Benitez's robbery, petitioner said: "Nah, Nah, Nah, I was at the corner of 600 Fulton. * * * I was hanging out with some bitches," (H. 59; H2. 241-42), who he denied knowing. (H. 59-60; H2. 242). Petitioner then said: "You're not pinning this on me, I wasn't there. * * * Fucking papies." (H. 60; H2. 242). When Re remarked that petitioner had a temper, petitioner responded: "Yeah, I got a temper." (H. 60; H2. 242). Re then gave petitioner another break, at around 10:30 p.m., so he could calm down, during which petitioner was given water and taken to the bathroom. (Re: H. 60; H2. 242-43; Hoctor: H2. 63, 79).

Hoctor testified that he again watched petitioner during the break, for approximately ten (10) minutes, at which time he observed petitioner "to be far more agitated" than he had been during the earlier break and "a little aggressive." (H2. 62, 76-8). According to Hoctor, petitioner said: "the papies should just, uhm, give it up and they wouldn't have to get hurt." (H2. 62-3).

11

When Hoctor asked what petitioner meant by that statement, petitioner said: "the papis should just give up their money instead of fighting." (H2. 63).

Re testified that the interview resumed at approximately 10:50 p.m., at which time petitioner said: "PR should have given it up. * * * This wouldn't have happened." (H. 60; H2. 244). When they went through petitioner's story again, and Re told him that James was "giving him up," petitioner said that he had seen James earlier that evening on Warner Avenue, at which time James had a gun on the seat of his car. (H. 60; H2. 244-45). Petitioner then said that Cordell had not been there and that Cordell had been with them earlier in the evening, but had left after having a problem with "somebody." (H. 60-1; H2. 245). Petitioner then told Re that he and James were driving on Cameron looking for someone to rob; that James had the gun; and that they parked, got out of the car, walked down Devon Road towards Hendrickson Avenue and made a right onto Hendrickson Avenue. (H. 61; H2. 7, 246). When Re discussed prints being on the gun, petitioner mentioned the possibility that he had struggled with James over the gun, but would not elaborate on that point. (H. 61; H2. 247-48). They took another break, during which petitioner slept in the interview room for about forty (40) minutes. (H. 61; H2. 251).

Following the break, Detective Maloney spoke with petitioner for about fifteen (15) minutes, then told Re that petitioner wanted to speak with him. (H. 61; H2. 12, 252-54). When Re went back into the interview room, petitioner told him that during his struggle with James, he was grazed by a bullet, then he went home and his grandmother placed gauze on the wound and drove him to the hospital. (H. 61; H2. 12, 253-54). Petitioner then told Re that he wanted to give a written statement to him. (H. 61; H2. 254).

At approximately 1:10 a.m., Re proceeded to take a six (6)-page written statement from

12

petitioner, which Re wrote and petitioner corrected and signed. (H. 61-3; H2. 254, 257-64). Re also drew a map for reference during the written statement. (H2. 7). While taking the written statement, petitioner told Re that when he and James got to Hendrickson Avenue, they made a right; that Benitez was behind them when they were walking on Hendrickson Avenue; and that at some point, they started to chase Benitez along a fence and came out onto Devon Road. (H2. 10). When Re questioned whether fingerprints would be found on the gun which could tie petitioner to the crime, petitioner told him that if his prints were found on the gun, it was because he had a struggle with James as the gun was going off while he was trying to get the gun away from James. (H2. 11).

Re testified that petitioner did not leave the homicide squad until approximately 2:45 a.m. on April 22, 2006, when he was taken to court, (H2. 179, 255), and that petitioner never asked to speak to an attorney, or to call his grandmother, during the time Re was with him. (H2. 287).

By order dated July 24, 2007, the trial court denied petitioner's motion to suppress finding, *inter alia*, that there was probable cause for petitioner's arrest; that petitioner's right to counsel had not attached when he was taken into custody on April 21, 2006; that there was no basis to suppress petitioner's statements to law enforcement officials since they were made after petitioner had knowingly waived his Miranda rights and there was no indication in the record of coercion; and that the photographic identification procedure was not suggestive.

### 2. The Trial

#### a. Pretrial Proceedings

Prior to the trial, defense counsel moved to prevent the prosecution from offering any

evidence regarding: (1) prior robberies petitioner allegedly committed, on the basis that the probative value of such evidence was outweighed by the potential for prejudice; (2) petitioner's "street name" "Vicious," on the basis that it was prejudicial and inflammatory; (3) petitioner's previous incarceration; (4) the fact that petitioner had procured a different gun from James in 2002; and (5) Re's statements (a) that a jury was only going to hear one side of the story, i.e., James's version of the events, on the basis that such a statement compromised petitioner's Fifth Amendment right against self-incrimination, and (b) that when discussing with petitioner how his prints may be on the gun, petitioner responded that he had struggled with James, on the basis that the statement was not properly noticed pursuant to Section 710.30 of the New York Criminal Procedure Law. (T1. 30-52). The prosecutor requested that he be permitted to present James's testimony that he understood from his ten (10)-year relationship with petitioner that petitioner's head nod meant that he had seen somebody that he wanted to rob. (T1. 29-30). The trial court ruled, *inter alia*, that the prosecution could not use petitioner's "street name" and could not elicit testimony from Re regarding a robbery petitioner committed seven (7) years earlier or petitioner's statement that he had not committed a robbery since he got out of jail, but could elicit testimony from James that petitioner had previously obtained a gun from him and from Re regarding petitioner's explanation for how his prints could be on the gun. (T1. 34, 41-3, 56). In addition, the trial court ruled that Re could testify that he told petitioner during his interrogation that the jury would only hear James's version, but it would charge the jury at the time that Re testified with respect to that statement that petitioner has no obligation to take the stand and that the burden is always on the prosecution. (T1. 49-50).

14

b.    The Prosecution's Case

At the trial, the following testimony was given:

Re's testimony at trial was essentially consistent with his testimony during the hearing.

(T1. 1293-1343, 1406-1732). In addition, Re testified that petitioner made the following written

statement, (T1. 1420-25):

> "* * * I understand my rights and I make the following statement freely and voluntarily. I am willing to give the statement without talking with a lawyer or having one present.
>
> About three weeks into October, 2005, * * * I was hanging out with Keith James and Cordell James. * * * We were driving around the area near the 600 Fulton building and the Stop and Shop next to it. [James] was driving his two-door white Grand Prix. * * *
>
> * * * [James] had his revolver handgun in the car, because I saw him during the evening putting it under the driver's seat.
>
> A couple of weeks before this I was over at [James's] house on 19 Harriet, Hempstead, and [James] was showing me the gun. It was black with a brown wooden handle. The cylinder that held the bullets kept coming off because a spring kept popping out. I think the gun held * * * 'four or five' bullets.
>
> * * *
>
> I put the * * * 'spring–' back in the * * * 'gun,' * * * and put the gun back together.
>
> Sometime around 6:00 a.m. on * * * 'the next day, Saturday,' * * * [w]e were stopped somewhere near the Stop and Shop. We had been driving around for several hours looking for a guy that Cordell had a beef with. * * * Cordell got out and went to the 600 Fulton Avenue building. When he didn't come back after 15 minutes, I got into the front seat of the Grand Prix. We drove down Hendrickson Avenue and pulled into the Stop and Shop fire lane. We stayed in the car, and [James] was talking to a guy that came up to the car. [James] spoke to the guy for five minutes and then we drove off. We drove around for five or ten minutes. We were talking in the car.
>
> * * *

15

[James] had no money, and [James] started to talk about robbing someone. We parked on Cameron, a street near the Stop and Shop. [James] had a black Mountain Gear jacket that had all sorts of pockets on it. It also had a hood. He took the revolver out of the car and put it in a [sic] inside pocket on the left side.

We walked down Devon Road towards Hendrickson Avenue. We made a right onto Hendrickson, and we were heading towards the Stop and Shop. We were looking for anyone that we could rob so we could get money to eat.

As we were walking up Hendrickson, [James] saw a poppy, a male hispanic [sic], walking in back of us. He was walking towards Front Street in the opposite direction. [James] started to chase the poppy, who is now across Devon Road but still on Hendrickson. [James] already had the gun out and started to shoot the gun at the poppy. He shot five times at the poppy as he was chasing him.

The poppy was running next to a fence. * * * I grabbed [James's] right arm that he had the gun in with my left hand, and I grabbed the gun with my right hand. He was shooting the gun as I grabbed him. The first couple of bullets that he fired were in the direction of the poppy, and the last rounds went towards the street. One of the rounds hit me in my right forearm. It did not go through my arm, it just grazed it.

The poppy kept running south on Hendrickson. Me and [James] started to run on Devon Road towards Cameron. When we got to the car, [James] got behind the driver's seat and I got in the front passenger seat. We drove down Fairview. We drove to [James's] house.

When we got there, [James] got out with the gun and put it alongside his house * * * 'on' the porch.

He then drove me to 108 Remsen where my grandmother lives. * * * I went into the house and told my grandmother I was running and had to jump and that I got my arm caught on a fence and ripped my jacket. The blue jacket I was wearing had a hole in the sleeve from the bullet. I believe I put the jacket in my living room closet where I think it still is. My grandmother * * * put a gauze bandage and an ace bandage on the wound because it was bleeding so much.

Later that day in the afternoon, she drove me to the hospital, Nassau Medical Center. I told the nurse I ripped my arm on a fence. I gave them my right name and date of birth. They put six stitches in my arm and sent me home.

Detective Re has written this statement for me. I have read it and it is the truth."

Re further testified that at approximately 3:15 a.m., after taking the written statement, he asked petitioner if he would consent to giving a videotaped statement and petitioner said no. (T1. 1432-33). Re then completed a video refusal form, which petitioner refused to sign. (T1. 1434). After voir dire by defense counsel, Re testified that when he asked petitioner to sign the form, petitioner "said it's [sic] not going to help me and he didn't sign the form." (T1. 1436). Defense counsel then moved for a mistrial on the basis that that statement of petitioner was never noticed or litigated at the pretrial hearing. (T1. 1436-38). The trial court denied defense counsel's application, but indicated that it would tell the jury "to disregard the last response by the detective. (T1. 1438-39). The trial court then instructed the jury to strike and disregard "the last response that [they] heard from Detective Re * * *." (T1. 1439).

James testified that on October 22, 2005, he went to the Stop and Shop in the early morning hours wearing gray Dickie's pants, a white button up shirt and a black Mountain Gear jacket. (T1. 1758-59, 2012-13). According to James, the jacket does not have a hood. (T1. 1761, 2011-12). On cross-examination, James testified that the jacket was a "dirt bike jacket" that had a "protection collar," not a hood. (T1. 2012). James further testified that he is five feet eleven inches (5' 11") tall and that petitioner is basically the same height as he is, (T1. 2040), and that as a result of a car accident on April 27, 1998, he walks with a limp and hobbles when he runs. (T1. 1749-52, 1833-34).

James testified that on October 22, 2005, he owned a gun, which he described as a revolver with a brown handle, for protection. (T1. 1761-62). According to James, the gun was "slightly broke," insofar as the cylinder would always fall out of it. (T1. 1762). James testified that he usually kept the gun in his room in the basement, but on October 22, 2005, petitioner had

17

it. (T1. 1762). According to James, he had given petitioner the gun about two and a half (2½) weeks earlier. (T1. 1763, 2040-41).

James testified that on October 22, 2005, he was driving a white Pontiac two (2)-door Grand Prix. (T1. 1763, 2042). He left his house early in the morning, sometime after 5:30 a.m., to go to "a female house" for a "late night date" when he saw petitioner, who was wearing blue pants, walking on the sidewalk. (T1. 1763, 1995, 1997-98, 2018-20). Petitioner told him that he was going to a store in the same direction as the female house, which is behind the Stop and Shop, so James offered him a ride. (T1. 1764). James pulled into the fire lane of the Stop and Shop and Raza came out, walked to the car and started talking to him. (T1. 1764). Petitioner got out of the car, walked to the front edge of the store, then gave James a head nod, which James knew meant the he was going around the corner because he "either seen a jookz [sic] or about to catch a jookz." (T1. 1765). According to James, a "jookz" is "a robbery or someone you want to rob or someone you could rob." (T1. 1765). Petitioner went around the corner and James spoke with Raza for several more minutes, then went to pick petitioner up. (T1. 1765-66). According to James, as he was turning the corner, he saw a struggle between petitioner and "the deceased," whom he described as a "poppy" or Spanish guy, (T1. 1771, 2051), so he rushed up to the corner, parked and ran over to assist petitioner. (T1. 1766-68). As James got to the fence, he heard a shot and someone scream. (T1. 1767-68). James then saw the guy who screamed turn around and run. (T1. 1768). Petitioner ran after him, they both turned the corner, then James heard another shot. (T1. 1768, 1803-04). After the second shot, James turned around and ran back to his car. (T1. 1768). As he was running back to his car, James heard a third shot. (T1. 1768). James testified that he and petitioner made it to his car at the same time and got in, at which time

18

petitioner said that he "was trying to catch a jookz." (T1. 1769). As James started to leave, he saw the gun in petitioner's left hand and three (3) shells in his right hand. (T1. 1769). James then drove petitioner to his grandmother's house on Remsen. (T1. 1769-71). According to James, he kept the gun but flushed the three (3) shells down the toilet the next day. (T1. 1771, 2049-50).

Raza testified that on October 22, 2005, he worked at the Stop and Shop, located at 618 Fulton Avenue, Hempstead, New York, from 8:00 p.m. until 6:30 a.m. (T1. 849). Some time between midnight and 1:00 a.m., Raza saw James and petitioner in the store. (T1. 858, 873-74, 876). Although Raza initially denied seeing James or petitioner at any other time that morning until approximately 6:15 a.m., upon seeing videotapes from the store on cross-examination, Raza admitted that James had also been in the store at approximately 3:00 a.m. and again at approximately 5:33 a.m. (T1. 884-913). The videotapes show James wearing light-colored jeans, a white shirt and black jacket. (T1. 983-84).

At approximately 6:30 a.m. on October 22, 2005, Raza went outside to start his car and saw James, whom he described as a black-skinned male, approximately five feet eleven inches (5' 11") tall with braided hair, driving a white two (2)-door Pontiac. (T1. 849, 852-53, 926-27, 978-79). Raza knew James for ten (10) or eleven (11) years as a customer of the store and also knew James's father. (Raza: T1. 852, 863, 869-72, 898-99; James: T1. 1755-56, 2005-06). Raza saw petitioner get out of the front passenger seat of the Pontiac wearing a black jacket with a hood and holding his right hand inside the jacket, and walk at a fast pace past Raza on the left side of the store on Hendrickson Avenue. (T1. 850, 853, 858-59, 958, 1003). According to Raza, he knew petitioner for approximately six (6) or seven (7) years as a customer of the store.

19

(T1. 852, 863, 869-72). Raza spoke with James for between two (2) to six (6) minutes, then James drove away on the right side of the store. (T1. 855-57, 927-28).

Rosales testified that on October 22, 2005, he lived with Benitez, his brother, his sister and his "in-law" Julio at an apartment at 60 Hendrickson Avenue. (T1. 1030-31). From approximately midnight on that date, he, Benitez and Jiminez drank beer in a car in the back of the parking lot of the building, and Julio joined them at approximately 4:00 a.m. (T1. 1031-34, 1059, 1061, 1069, 1105). At approximately 6:20 a.m., at Julio's request, Benitez left to get more beer. (T1. 1034, 1071). Rosales identified Benitez as the man depicted on the store's videotape at approximately 6:33 a.m. (T1. 1045). Approximately ten (10) to fifteen (15) minutes later, Rosales heard a shot and a scream and saw Benitez walking while holding the beer in his right hand and clutching his abdomen with his left hand, then he got out of the car and heard two (2) more shots. (T1. 1036-38, 1072-73, 1076, 1100-01). Rosales then ran to Benitez, at which time he saw a person, wearing a blue or black jacket with a hood covering his head and dark blue or black jeans, run away. (T1. 1038-40). Rosales testified that he saw a second person hiding behind the fence. (T1. 1038-41). According to Rosales, Julio then called the police. (T1. 1043).

Palacios testified that on October 22, 2005, between 6:25 and 6:30 a.m., he was sleeping on his couch in his apartment on the first floor at 60 Hendrickson Avenue when he heard a shot, a scream, then two (2) more shots. (T1. 1017-19, 1025). Palacios looked out his front window and saw a man, wearing all black "from head to toe", including a hood, walk by a white fence, then turn right to walk south. (T1. 1019, 1021, 1026-27). Palacios never saw the man's face. (T1. 1022). Palacios then called 911. (T1. 1022-24).

Bernice testified that on October 22, 2005, at approximately 6:30 a.m., she was in bed

when she heard a "pop," then her daughter called the police and Bernice looked out her window, which faced Hendrickson Avenue. (T1. 1155-57, 1162, 1174-75). According to Bernice, she saw a person, approximately five feet ten inches (5' 10") tall and wearing a black or dark navy hooded shirt, walking with a limp on Hendrickson Avenue heading towards Fulton Street. (T1. 1157, 1161, 1178-83, 1191-92, 1197-99, 1203). Bernice did not see the person's face and denied ever telling Re that she had. (T1. 1187-90, 1194-95, 1200, 1205-07). On cross-examination, Jones testified that she heard two (2) shots and that her daughter had told the police that she saw somebody running, not limping. (T1. 1173, 1178-79).

Marjorie Dunn ("Dunn") testified that on October 22, 2005, at approximately 6:30 a.m., she was in her bed in a second-floor apartment at 6 Devon Road, when she heard three (3) loud gunshots. (T1. 1346-47, 1349). When she looked out the window of her bedroom, which faced Devon Road, she saw a male wearing blue jeans and a dark hooded jacket, with the hood up, running east on Devon Road. (T1. 1346-48, 1352). On cross-examination, Dunn testified that there was nothing unusual about the way the man was running and she did not observe that he had any type of disability. (T1. 1352).

On October 23, 2005, Dr. Gerard Catanese ("Catanese") performed an autopsy on Benitez, during which he observed a gunshot wound "a little less of the midline in the middle of his chest," a small abrasion on his left forehead, consistent with a punch or fall, and two (2) other small abrasions on his right middle finger. (T1. 1214, 1220, 1223). According to Catanese, the bullet had perforated the skin, subcutaneous tissues, sternum, pericardial sac, right ventricle and atrium of the heart and right lobe of the lung and was recovered from the space between two (2) of the ribs in the back of his chest cavity. (T1. 1215). After recovering the bullet, Catanese

turned it over to Detective Sergeant Robert Nemeth ("Nemeth"), of the NCPD Forensic Evidence Bureau, Firearms Identification Section. (Catanese: T1. 1215-16; Nemeth: T1. 1236; Re: T1. 1300). Catanese testified that the bullet traveled from the front to back, left to right and downwards and that the cause of Benitez's death was "[a] penetrating gunshot wound to the chest with perforations of the heart and lung." (T1. 1217, 1221, 1229, 1233).

Nemeth testified that the bullet recovered from Benitez's body was a .32 caliber bullet with "a five right rifling characteristic of approximately 94 to 98 grains, which is consistent with a projectile used in a .32 Smith and Wesson cartridge." (T1. 1237, 1240).

James testified that on April 16, 2006, after he shot Shante Blanton ("Blanton") in front of his house at 19 Harriet Avenue, he went back into his house, threw the shells in the toilet, took the cylinder out of the gun and gave it to his grandmother, then threw the gun into the furnace in the basement. (T1. 1785-87, 1937-41).

Lieutenant Joseph Sortino ("Sortino"), from the Hempstead Village Police Department, testified that on April 16, 2006, at approximately 2:25 a.m., he responded to Harriet Avenue after receiving two (2) radio calls, first about a disturbance, then about shots fired. (T1. 1263). After receiving information from a civilian at the scene of an apparent gunshot victim, Sortino and three (3) police officers went to 19 Harriet Avenue, where they spoke with Willie James ("Willie"), who consented to the officers entering the home to speak with him in private. (T1. 1263-66, 1271-72). Inside the home, the officers observed a black male, who identified himself to them as James. (T1. 1267). According to Sortino, James was calm and cooperative and was handcuffed and taken to headquarters. (T1. 1267, 1270).

James testified that after he got to the precinct, he told the police officers that the gun he

used to shoot Blanton was in the furnace and that it had "a poppy on it," meaning that a Spanish person had been killed with that gun. (T1. 1791-92, 1953).[4]

Sortino subsequently searched for evidence, particularly the gun that may have possibly been used in the Blanton shooting, at James's house. (Sortino: T1. 1267, 1273-76, 1279). After Willie consented to a search of the entire house, and signed a consent form, Sortino went to the basement, where he found a handgun in the furnace. (Sortino: T1. 1267-70, 1278, 1280-81). According to Sortino, Willie seemed calm and was very cooperative. (T1. 1270). On cross-examination, Sortino testified that he was not present in the basement when the gun was actually recovered from the furnace and that it was later determined that the handgun was not operable in the condition in which it was recovered from the furnace because the cylinder was missing. (T1. 1277, 1282, 1288). Police Officer Roger O'Hara ("O'Hara"), from the Crime Scene Search Section of the NCPD, testified that on April 16, 2006, at approximately 4:30 a.m., he responded to 19 Harriet Avenue, where he recovered a .32 Taurus revolver frame out of the furnace. (T1. 835-36, 843).

At defense counsel's request, the parties stipulated that petitioner "had no involvement in the shooting of Shante Blanton which occurred on April 16, 2006." (T1. 1405-06).

Nemeth testified that on April 17, 2006, he received the frame and operating mechanism inside the frame of a Taurus Model 73 chambered for a .32 Smith and Wesson long revolver

---

[4] After James's statement to Re on the Blanton case got suppressed, and Blanton decided not to testify against him, James pled guilty to criminal possession of a weapon in both the Blanton case and the Benitez case. (T1. 1797). James entered into a cooperation agreement with the prosecution in which he would receive seven (7) years incarceration in exchange for his truthful testimony at petitioner's trial, otherwise he would receive fourteen (14) years. (T1. 1798-99).

cartridge, serial number 1B59668. (T1. 1238). Defense counsel stipulated, and Nemeth testified, that the bullet recovered from Benitez's body was fired from that gun. (T1. 1239, 1241).

Detective Scott Kovar, of the NCPD Forensic Evidence Bureau, testified that based upon his examination of the clothes Benitez had been wearing, the gunshot was "not contact or near contact," i.e., the shot was made from more than three (3) inches away. (T1. 1257-58).

At the close of the prosecution's case, defense counsel moved for a trial order of dismissal on the basis that the prosecution failed to prove "any of the charges on a prima facie level with respect to the murder charge * * * [and] there is a lack of evidence with respect to * * * [petitioner] actually having committed that or having committed the robbery * * *." (T1. 2061). The trial court denied the motion. (T1. 2062).

c.    The Defense

The parties stipulated that if Detective Federico Trillo were called to testify on behalf of the defense, he would say "that during the investigation of this case, he interviewed Jose Rosales on two different occasions in Spanish. On both of those occasions Mr. Rosales was distraught and reluctant to speak with him. On neither occasion did Mr. Rosales tell Detective Trillo that he saw any subjects in the area of the walkway." (T1. 2077-78). The defense then rested. (T1. 2078).

At the close of the case, defense counsel moved to dismiss the indictment against petitioner. (T1. 2078). The trial court denied the motion. (T1. 2079).

### d. The Verdict

The jury found petitioner guilty of the crimes of murder in the second degree, attempt to commit the crime of robbery in the first degree and attempt to commit the crime of robbery in the second degree, and not guilty of the crimes of criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. (T1. 2264).

### B. Procedural History

Prior to sentencing, petitioner filed a *pro se* motion to set aside the verdict pursuant to Section 330.30 of the New York Criminal Procedure Law ("the 330.30 motion") on the basis that the indictment was jurisdictionally defective. By order dated May 13, 2008, the trial court denied petitioner's motion. People v. White, No. 1596N/06 (N.Y. Sup. Ct. May 13, 2008) (Brown, J.).

On June 6, 2008, a judgment of conviction was entered against petitioner in the trial court upon the jury verdict and imposition of sentence, as a second felony offender, to, *inter alia*, concurrent terms of imprisonment of twenty-five (25) years to life upon the conviction of murder in the second degree, fifteen (15) years upon the conviction of attempted robbery in the first degree and seven (7) years upon the conviction of attempted robbery in the second degree. (S. 20-21).

Petitioner appealed his judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("Appellate Division") on the grounds, *inter alia*: (1) that the trial court erred in (a) denying his pretrial motion to suppress his statements to law enforcement officials, (b) failing to give an accomplice-corroboration charge

25

pursuant to New York Criminal Procedure Law § 60.22(1) and (c) denying his request for a mistrial after James suggested that he had been involved in an uncharged crime; (2) that juror misconduct deprived him of a fair trial; (3) that he was denied his right to be present at a material stage of the trial when the trial court questioned a court officer in camera regarding the incident which gave rise to his allegation of juror misconduct; (4) that the verdict was legally insufficient and against the weight of the evidence; (5) that he received ineffective assistance of counsel at trial; (6) that he was prejudiced by the prosecution's late disclosure of a witness statement; (7) that he was prejudiced by the prosecutor's comments during summation; and (8) that the sentence imposed was harsh and excessive.[5]

By order dated May 4, 2010, the Appellate Division affirmed the judgment, finding, *inter alia*: (1) that the trial court properly denied petitioner's motion to suppress his statements to the police; (2) that petitioner's claim that the trial court erred in failing to give an accomplice-corroboration charge was unpreserved for appellate review and, in any event, was without merit; (3) that the trial court's inquiry into the alleged juror misconduct was sufficient to establish that the allegation was without merit; (4) that the trial court's in camera questioning of a court officer in the presence of defense counsel did not deprive petitioner of his right to be present at a material stage of the trial; (5) that the trial court providently exercised its discretion in denying petitioner's request for a mistrial and its curative instruction was sufficient to ameliorate any prejudice to petitioner resulting from James's unresponsive answer on cross-examination; (6)

---

[5] Petitioner was granted leave to file a supplemental *pro se* brief on the direct appeal from his judgment of conviction.

26

that petitioner's legal insufficiency claim was unpreserved for appellate review and, in any event, was without merit and the verdict was not against the weight of the evidence; (7) that the sentence imposed was not excessive; and (8) that petitioner's remaining contentions were without merit. People v. White, 73 A.D.3d 820, 900 N.Y.S.2d 407 (2d Dept. 2010). On June 29, 2010, the Appellate Division denied petitioner's application seeking to reargue his appeal. On July 8, 2010, the Court of Appeals of the State of New York denied petitioner's application for leave to appeal to that court from the May 4, 2010 order of the Appellate Division affirming his judgment of conviction. People v. White, 15 N.Y.3d 779, 907 N.Y.S.2d 468, 933 N.E.2d 1061 (2010).

Petitioner also sought to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("the 440.10 motion"), on the basis, *inter alia*, of newly discovered evidence, prosecutorial misconduct and ineffective assistance of trial counsel. Specifically, petitioner alleged: (1) that the judgment of conviction was procured by duress, misrepresentation or fraud on the part of the prosecutor or a person acting for or on behalf of the prosecutor; (2) that material evidence adduced at trial (a) was false and known by the prosecutor or trial court to be false prior to the entry of judgment and (b) was procured in violation of petitioner's constitutional rights; (3) that improper and prejudicial conduct not appearing on the record occurred during the trial, i.e., that James and Rosales had been suborned to commit perjury by the prosecutor and/or lead detective and the prosecutor had been unable to locate another witness for trial; (4) that new evidence discovered since entry of the judgment of conviction creates a probability that had it been received at the trial the verdict would have been

27

more favorable to petitioner; and (5) that the judgment of conviction was obtained in violation of petitioner's rights to due process and the effective assistance of counsel. The "new" evidence allegedly discovered by petitioner after his trial consists of the following three (3) documents that James had annexed as exhibits to his motion to withdraw his guilty plea to the charges under the same indictment as petitioner: (1) a letter by James to his attorney, notarized on July 19, 2007, advising that he wanted to withdraw his guilty plea because he had been confused about the terms of his plea agreement and had felt pressured to enter into the agreement and to cooperate with the prosecution in building a case against petitioner; (2) a letter by James to the Hon. William C. Donnino, notarized on January 16, 2008, advising that he had given petitioner up after he had been promised immunity following his April 16, 2006 arrest, but that his statement concerning crimes involving petitioner was not voluntary; and (3) a letter by James to Justice Donnino, notarized on January 23, 2008, advising that he had been coerced by his attorney to take the plea agreement and had been compelled to act against his will, and that the prosecutor had used threatening tactics to convince him to lie.

By order dated June 11, 2010, the County Court of the State of New York, County of Nassau (Ayres, J.) ("the motion court"), *inter alia*, denied the 440.10 motion without a hearing. People v. White, Indictment No. 1596N-06 (Sup. Ct., Nassau Co. June 11, 2010). The motion court found, *inter alia*: (1) that petitioner had failed to submit sworn allegations that support his claim that the judgment of conviction was procured by duress, misrepresentation or fraud; (2) that the statements set forth in James's letters only "go to the nature of James' plea," which he subsequently acknowledged in open court was voluntary, and not one of them states that James

28

was going to, or did, testify falsely in the matter against petitioner or that James was forced or compelled to testify falsely against petitioner; (3) that the judgment of conviction against petitioner was not procured by duress, misrepresentation or fraud on the part of the trial court, prosecutor or a person acting for or on behalf of the trial court or prosecutor; (4) that petitioner's conviction did not rest upon the testimony of James because "there was substantial evidence introduced at trial for the jury to consider in determining [petitioner's] guilt outside of James' testimony, including but not limited to, [petitioner's] oral and written statements; the testimony of [Raza] and [Rosales], and the ballistics report;" (5) that petitioner had failed to establish that James's trial testimony regarding petitioner's involvement in the crime was false, i.e., that James had been lying when he testified that petitioner had robbed and shot Benitez; (6) that, in any event, there was no evidence in the record indicating that the prosecutor knew that James's testimony, or the testimony of any witness at trial, was false; (7) that petitioner's conclusory claims of prosecutorial misconduct "lack[ed] * * * the requisite foundation to warrant a hearing" and petitioner had "failed to satisfy his burden * * * of supplying sworn corroborative evidentiary facts to support his allegations [of misconduct];" (8) that James's letters were not material to the issues presented at petitioner's trial and would not likely have changed the result if a new trial was granted; (9) that defense counsel's representation of petitioner with respect to the motion to set aside the verdict was not ineffective since "the motion obviously lacked merit" and defense counsel's comments to the court that "he could not do anything about [petitioner's] conviction with respect to the newly-discovered evidence" "were not adverse to petitioner's interests and did not influence the court's decision to deny the motion;" and (10) that petitioner's suggestion that a

29

conspiracy exists involving the trial court, the prosecution, the lead detective and James's attorney were "without merit and purely speculative and without proper substantiation." Id.

By order dated February 9, 2011, the Appellate Division denied petitioner's application for leave to appeal the June 11, 2010 order of the motion court. By order dated May 26, 2011, the Appellate Division denied petitioner's motion for leave to appeal to the Court of Appeals from its February 9, 2011 order denying petitioner's application for leave to appeal the June 11, 2010 order of the motion court.

On November 5, 2010, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging: (1) that the trial court erred (a) in failing to give the jury an accomplice-corroboration charge (Ground One), (b) in failing to "make a probing inquiry regarding juror misconduct" (Ground Three), and (c) in denying his motion to suppress statements made to law enforcement officers (Ground Five); (2) that petitioner was denied the effective assistance of trial counsel by counsel's failure (a) to request an accomplice-corroboration charge (Ground Two), (b) to argue the validity of the arrest warrant (Ground Eight), and (c) to call a rebuttal witness (Ground Eleven); (3) that petitioner was denied a fair trial (a) as a result of an unresponsive statement made by James during cross-examination (Ground Four), (b) by the prosecutor's comment during summation which vouched for a witness (Ground Nine) and (c) by the prosecution's withholding of an exculpatory witness statement (Ground Ten); (4) that the evidence was legally insufficient or the verdict was against the weight of the evidence (Ground Six); (5) that the sentence imposed was excessive (Ground Seven); and (6) that petitioner was denied his right to be present at a material stage of the proceedings

30

(Ground Twelve). Respondent filed his return to the petition on January 20, 2011.

By order dated October 3, 2011, plaintiff was granted leave to amend his petition. In his amended petition, petitioner raises the following additional claims: (1) that the judgment of conviction was procured by duress, misrepresentation or fraud on the part of the prosecutor or a person acting for or on behalf of the prosecutor; (2) that material evidence adduced at his trial was false and procured in violation of his constitutional rights; (3) that improper and prejudicial conduct not appearing in the record occurred during his trial which would have required reversal if it had appeared in the record; (4) that there is newly discovered evidence that would probably change the result below; and (5) that the judgment of conviction was obtained in violation of his constitutional rights to due process and the effective assistance of counsel.

By order dated June 28, 2011, the Appellate Division denied petitioner's application for a writ of error coram nobis seeking to vacate, on the ground of ineffective assistance of appellate counsel, the Appellate Division's May 4, 2010 order affirming his judgment of conviction. People v. White, 85 A.D.3d 1205, 926 N.Y.S.2d 297 (2d Dept. 2011). On October 4, 2011, the Court of Appeals of the State of New York denied petitioner's application for leave to appeal to that court from the June 28, 2011 order of the Appellate Division. People v. White, 17 N.Y.3d 905, 933 N.Y.S.2d 660, 957 N.E.2d 1164 (2011).

On June 1, 2012, respondent filed his return to the amended petition in accordance with this Court's May 9, 2012 order.

31

## III. DISCUSSION

### A. Discovery

Petitioner seeks the following discovery in this proceeding as purportedly necessary to establish that his judgment of conviction was procured through the false testimony of James: (1) leave to serve interrogatories upon Judge William Donnino, who presided over James's plea proceedings; Judge Jeffrey Brown, who presided over petitioner's trial and sentence; Jeffrey Groder, petitioner's trial counsel; and William Petrillo ("Petrillo"), James's attorney at the time of his plea, (2) documents from Kathleen Rice, the Nassau County District Attorney; Kenneth St. Bernard, the prosecutor at petitioner's trial; Gregory Grizopoulos, James's attorney at the time of his sentencing; James; and Petrillo; and (3) leave to subpoena the Nassau County Sheriff's Department for the following items for the period from June 1, 2007 through August 31, 2007: (a) all telephone conversations placed by James from the Nassau County Correctional Center ("NCCC"); (b) transcripts of those telephone conversations; (c) visitation records of the NCCC pertaining to James's visitors; (d) transportation records of the NCCC regarding medical trips, court appearances and debriefing appearances of James; and (e) notary public records containing the names of inmates seeking notary, and officers providing notary service for James.

Rule 6(a) of the Habeas Rules provides, in pertinent part, that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Although "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course," Bracy v. Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997), "discovery may be granted upon a

32

showing of good cause." Drake v. Portuondo ("Drake I"), 321 F.3d 338, 346 (2d Cir. 2003) (quotations and citation omitted). "[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is * * * entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." Harris v. Nelson, 394 U.S. 286, 300, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969); see also Drake I, 321 F.3d at 345.

"The Court may, in its discretion, deny discovery where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition." Hirschfeld v. Commissioner of Division of Parole, 215 F.R.D. 464, 465 (S.D.N.Y. 2003); see also Martin v. U.S., 834 F. Supp. 2d 115, 140 (E.D.N.Y. 2011); Charles v. Artuz, 21 F. Supp. 2d 168, 169-70 (E.D.N.Y. 1998). Discovery requests that are based on speculation and surmise do not amount to good cause. See Mills v. Lempke, No. 11-cv-0440, 2012 WL 1574749, at *6 (W.D.N.Y. May 3, 2012). "Where the request for discovery is a mere fishing expedition, the court will not grant it." Corines v. Superintendent, Otisville Correctional Facility, No. 05-cv-2056, 2008 WL 4831729 (E.D.N.Y. Nov. 6, 2008); see also Mills, 2012 WL 1574749, at *5-6; Thompson v. Artus, No. 06-cv-254, 2007 WL 2668079, at * 1 (W.D.N.Y. Sept. 6, 2007); Perez v. U.S., 378 F. Supp. 2d 150, 157 (E.D.N.Y. 2005).

Since petitioner has provided no specific evidence that his overbroad and largely irrelevant demands would lead to discovery that actually supports any of the claims in his habeas petition or amended petition, his motion for discovery is denied.

33

B.  Procedural Issues

1.  Procedurally Defaulted Claims

Respondent contends that petitioner's claims that the trial court erred in failing to give an accomplice-corroboration charge to the jury and that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt are procedurally barred.

Under the doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, — U.S. —, 132 S. Ct. 1309, 1316, 182 L. Ed. 2d 272 (2012). "A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." Id.; see also Maples v. Thomas, — U.S. —, 132 S. Ct. 912, 922, 181 L. Ed. 2d 807 (2012)(holding that a federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state law ground); Walker v. Martin, – U.S. –, 131 S. Ct. 1120, 1127-28, 179 L.Ed.2d 62 (2011) (accord). Exceptions to the procedural default doctrine exist where: (1) the prisoner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law, Martinez, — U.S. —, 132 S. Ct. 1316; Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); or (2) the failure to consider the claim will result in "a fundamental miscarriage of justice," i.e., "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed.

34

2d 397 (1986); see also Rivas v. Fischer, 687 F.3d 514, 541 (2012). A claim of actual innocence must be both "credible," i.e., "supported by new reliable evidence * * * that was not presented at trial," Rivas, 687 F.3d at 541 (quotations and citation omitted), and "compelling," i.e., it is "more likely than not, in light of the new evidence," that no reasonable juror would find him guilty beyond a reasonable doubt." Id.

a.      Failure to Give an Accomplice-Corroboration Jury Charge

Prior to the close of the prosecution's case, the trial court held a charge conference during which neither party requested any additional instructions than those the trial court indicated it would charge, (T1. 2038-39), although defense counsel objected to the trial court's proposed instruction regarding accessorial liability on the basis that James did not share the intent to commit the robbery or murder. (T1. 2065-67). The trial court charged the jury, in relevant part, that summations are not evidence, (T1. 2183); that any arguments made by counsel during trial or summations that they find to be unreasonable or illogical or unsupported by the evidence may be rejected, (T1. 2183, 2187); that they may not consider any testimony which was stricken from the record, (T1. 2184); how to assess credibility, (T1. 2184-85), and evaluate evidence and witness testimony, (T1. 2189, 2194-2200); that they are the sole finders of fact, (T1. 2185-86, 2193-94); that there is no duty upon the defense to call any witness, (T1. 2190-91); that the prosecution must prove each and every essential element of the crime charged beyond a reasonable doubt, (T1. 2191-93), and the burden never shifts to the defense, (T1. 2191-92); and that a person may be held criminally liable for the conduct of another, i.e., on a theory of accessorial liability, (T1.

35

2206-07). Following the charge, neither party made any additional requests to charge or objected to the charge as given. (T1. 2224).

On direct appeal of the judgment of conviction, the Appellate Division found that petitioner's claim with respect to the trial court's failure to give an accomplice-corroboration jury charge was unpreserved for appellate review pursuant to Section 470.05(2) of the New York Criminal Procedure Law ("New York's contemporaneous rule") and, in any event, is without merit. "[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); see also Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) ("Even where the state court has ruled on the merits of a federal claim 'in the alternative,' federal habeas review is foreclosed where the state court has also expressly relied on the petitioner's procedural default.")

Absent exceptional circumstances not present here, New York's contemporaneous objection rule is an adequate and independent state law ground barring federal review of that issue absent a showing of cause and prejudice, or a fundamental miscarriage of justice. See Gutierrez v. Smith, 702 F.3d 103, 111 (2d Cir. 2012); Whitley v. Ercole, 642 F.3d 278, 280, 292 (2d Cir. 2011), cert. denied, 132 S. Ct. 791, 181 L. Ed. 2d 489 (2011). The Second Circuit has held that "cause" for a procedural default may be demonstrated by showing: (a) that "some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule," Gutierrez, 702 F.3d at 111; or (b) futility, i.e., that "prior state case law has consistently rejected a particular constitutional claim." Id. at 111-12. Nonetheless, "futility

36

cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Id. at 112 (quoting Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998)). "Prejudice" is established by showing that errors at trial "resulted in 'substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions.'" Id. (quoting Murray, 477 U.S. at 494, 106 S. Ct. 2678).

Since petitioner has not demonstrated cause for the failure to raise his claim challenging the failure of the trial court to give an accomplice-corroboration charge in state court and actual prejudice therefrom, or that a failure to consider that claim will result in a fundamental miscarriage of justice, his claim with respect to the trial court's failure to give an accomplice-corroboration charge is dismissed as procedurally defaulted.

In any event, petitioner's claim that the trial court erred in failing to give an accomplice-corroboration charge raises an issue of state law only and is not cognizable on federal habeas review. See Caminetti v. U.S., 242 U.S. 470, 495, 37 S. Ct. 192, 61 L. Ed. 442 (1917) ("[T]here is no absolute rule of [federal] law preventing convictions on the testimony of accomplices if juries believe them."); Young v. McGinnis, 319 Fed. Appx. 12, 13 (2d Cir. Mar. 27, 2009) (summary order) (holding that regardless of whether there was a violation of state law in failing to give accomplice-corroboration instruction, "there was no violation of federal law, let alone of any federal constitutional right."); U.S. v. Elusma, 849 F.2d 76, 79 (2d Cir. 1988) ("An accomplice's testimony * * * need not be corroborated to establish guilt."); Diaz v. Herbert, 317 F. Supp. 2d 462, 477 (S.D.N.Y. 2004) (holding that since, under federal law, accomplice testimony that is uncorroborated goes to the weight of the evidence and not its admissibility, a

claim regarding the state court's failure to give an accomplice-corroboration charge does not warrant federal habeas relief); Gaiter v. Lord, 917 F. Supp. 145, 150 (E.D.N.Y. 1996) (holding that a claim regarding the failure to give an accomplice-corroboration charge is not cognizable on federal habeas corpus review). Accordingly, petitioner's claim that the trial court failed to give an accomplice-corroboration charge (Ground One) is dismissed.

b.     Legal Insufficiency Claim

Respondent contends, *inter alia*, that petitioner did not exhaust his legal insufficiency claim and that, in any event, the legal insufficiency claim is procedurally barred.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §2254(b)(1)(A); see also Cullen v. Pinholster, — U.S. —, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief."); Jones v. Murphy, 694 F.3d 246-47 (2d Cir. 2012), cert. denied, 133 S. Ct. 1247 (Feb. 19, 2013) ("Under AEDPA, a prisoner in custody pursuant to a state court judgment must generally exhaust state court remedies before seeking federal habeas corpus review.") "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights," Cornell v. Kirkpatrick, 665 F.3d 369, 375 (2d Cir. 2011) (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011), cert. denied, 132 S. Ct. 265, 181 L. Ed. 2d

155 (2011)), i.e., the "petitioner must 'present[ ] his [or her] claim *to the highest court of the state.*' " Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (alterations in original; emphasis added) (quoting Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000)). "In developing and refining the 'fairly present[ed]' standard, the Supreme Court has concentrated on the degree of similarity between the claims that a petitioner presented to the state and federal courts." Smith v. Duncan, 411 F.3d 340, 349 (2d Cir. 2005) (alteration in original, citation omitted).

On direct appeal to the Appellate Division, petitioner argued that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt. However, petitioner did not present that claim in his application for leave to appeal to the New York State Court of Appeals. Accordingly, petitioner did not exhaust his legal insufficiency claim in the state courts.

Nonetheless, to the extent that no state remedies remain "available" to petitioner, see 28 U.S.C. § 2254(b)(1)(B)(i), with regard to his unexhausted legal insufficiency claim, he has met "the technical requirements for exhaustion." Coleman, 501 U.S. at 732, 111 S. Ct. 2546; see also St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004) ("[E]ven if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law.") "When a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008) (quoting Coleman, 501 U.S. at 735 n. 1, 111 S. Ct. 2546); see also Jones, 694 F.3d at 247. Petitioner has procedurally defaulted on his legal

39

insufficiency claim because New York's procedural rules now bar him from raising it in New York courts. See N.Y. Court Rules, § 500.10(a) (authorizing only one request for review of a conviction); Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001) ("Petitioner was entitled to one (and only one) appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals, both of which he pursued long ago. N.Y. Crim. Proc. Law § 450.10(1); N.Y. Court R. § 500.10(a)). Accordingly, although petitioner's legally insufficiency claim is technically exhausted, it is procedurally defaulted.

Moreover, the Appellate Division denied petitioner's legal insufficiency claim as "unpreserved for appellate review" pursuant to Section 470.05(2) of the New York Criminal Procedure Law, then ruled "in any event" that the claim was without merit. Specifically, defense counsel made only general motions to dismiss at the close of the People's case and again at the close of all evidence. "In New York State, a defendant may not raise, for the first time on appeal, arguments concerning the legal sufficiency of the prosecution's evidence that were not raised with specificity in the trial court." King v. Artus, 259 Fed. Appx. 346, 347 (2d Cir. Jan. 2, 2008) (summary order). Thus, petitioner's legal insufficiency claim is procedurally defaulted on that basis as well. See, e.g. id.; Fore v. Ercole, 594 F. Supp. 2d 281, 289 (E.D.N.Y. 2009).

Since petitioner has not demonstrated cause for the failure to raise his legal insufficiency claim in the state courts and actual prejudice therefrom, or that a failure to consider that claim will result in a fundamental miscarriage of justice, his legal insufficiency claim (Ground Six) is dismissed as procedurally defaulted.

c.     Excessive Sentence Claim

Although petitioner raised an excessive sentence claim on direct appeal of his judgment

of conviction, he did not challenge his sentence under federal law, nor did he raise any excessive

sentence claim in his application for leave to appeal to the New York State Court of Appeals.

Nonetheless, for the reasons set forth above, petitioner's excessive sentence claim is technically

exhausted, though procedurally defaulted.  Since petitioner has not demonstrated cause for the

failure to raise his federal excessive sentence claim before the state courts and actual prejudice

therefrom, or that a failure to consider that claim will result in a fundamental miscarriage of

justice, his excessive sentence claim (Ground Seven) is dismissed as procedurally defaulted.

In any event, in the Second Circuit, "[n]o federal constitutional issue is presented where .

. . the sentence is within the range prescribed by state law."  White v. Keane, 969 F.2d 1381,

1383 (2d Cir. 1992); see also Dorsey v. Irvin, 56 F.3d 425, 427 (2d Cir. 1995); United States v.

Gonzalez, 922 F.2d 1044, 1053 (2d Cir. 1991) (finding that courts should review the

disproportionality of sentences only in rare cases because the legislature's fixing of terms for

imprisonment is presumptively valid).  Since petitioner's sentence was legal under New York

State law, petitioner fails to state a cognizable constitutional claim with respect to his sentence.


2.     Fourth Amendment Claims

In Stone v. Powell, the Supreme Court held that

> "where the State has provided an opportunity for full and fair litigation of a Fourth
> Amendment claim, a state prisoner may not be granted federal habeas corpus
> relief on the ground that evidence obtained in an unconstitutional search or seizure
> was introduced at his trial."

428 U.S. 465, 494, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976); see also Graham v. Costello, 299

F.3d 129, 133-34 (2d Cir. 2002) ("As a general rule, Fourth Amendment claims are not

reviewable by the federal courts when raised in a petition brought under Section 2254 unless the

state prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in

the state court. * * * [T]he bar to federal habeas review of Fourth Amendment claims is

permanent and incurable absent a showing that the state failed to provide a full and fair

opportunity to litigate the claim * * *.") The Second Circuit "has interpreted Powell as requiring

only that the state courts provide an *opportunity* for full and fair litigation of a fourth amendment

claim," Capellan v. Riley, 975 F.2d 67, 71 (2d Cir. 1992) (emphasis in original), and "has

developed a litmus test to discern when a state prisoner has been denied [such] an opportunity *

* *." Id., at 70.  Pursuant to that test, habeas review of Fourth Amendment claims is permitted

"in only one of two instances: (a) if the state has provided no corrective procedures at all to

redress the alleged fourth amendment violations; or (b) if the state has provided a corrective

mechanism, but the defendant was precluded from using that mechanism because of an

unconscionable breakdown in the underlying process." Id.  Even if the state courts erroneously

decided the Fourth Amendment issue, "a petitioner cannot gain federal review of a fourth

amendment claim simply because the federal court may have reached a different result." Id. at

71. "[A] mere disagreement with the outcome of a state court ruling is not the equivalent of an

unconscionable breakdown in the state's corrective process." Id. at 72.  The focus, then, is not

"on the correctness of the *outcome* resulting from the application of adequate state court

corrective procedures, [but] rather * * * on the existence and application of the *corrective*

42

*procedures* themselves * * *." Id. at 71 (emphasis in original).

Petitioner's Fourth Amendment claims were fully considered by the hearing court and appellate courts, resulting in findings by the Appellate Division that the police had probable cause to arrest petitioner and that petitioner's statements to law enforcement officers were voluntarily made after petitioner was informed of, and waived, his Miranda rights. People v. White, 73 A.D.3d at 820-21, 900 N.Y.S.2d 407. Thus, petitioner not only had a full and fair opportunity to litigate his Fourth Amendment claims, he actually fully and fairly litigated those claims. His "mere disagreement" with the outcome of the state courts' rulings does not constitute "an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72; see, e.g. Kirk v. Burge, 646 F. Supp. 2d 534, 545 (S.D.N.Y. 2009). Since, under Powell, petitioner's Fourth Amendment claims are not cognizable on federal habeas review, those claims (Ground Five) are dismissed.


### 3. Weight of the Evidence Claim

Any contention that the verdict was against the weight of the evidence presents a claim under state law that is not cognizable on federal habeas review. McKinnon v. Superintendent, Great Meadow Correctional Facility, 422 Fed. Appx. 69, 75 (2d Cir. May 24, 2011), cert. denied, 132 S. Ct. 1151, 181 L. Ed. 2d 1024 (2012); see also Perez v. Smith, 791 F.Supp.2d 291, 303 (E.D.N.Y. 2011); Garrett v. Perlman, 438 F.Supp.2d 467, 470 (S.D.N.Y. 2006); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001). Accordingly, petitioner's weight of the evidence claim (Ground Six) is dismissed.

C.    Merits

1.    Standard of Review under AEDPA

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus that has met

the procedural prerequisites of the AEDPA:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2)

reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing

Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

A state court determination is "contrary to * * * clearly established Federal law," 28

U.S.C. § 2254(d), "if the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently than [the

Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S.

362, 412–13, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000); see also Lafler v. Cooper, — U.S. —,

132 S.Ct. 1376, 1390, 182 L. Ed. 2d 398 (2012) ("A decision is contrary to clearly established

law if the state court applies a rule that contradicts the governing law set forth in Supreme Court

cases." (alterations, quotations and citation omitted)).  Alternatively, under the "unreasonable

application" standard of Section 2254(d), "a federal habeas court may grant the writ if the state

court identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413,

120 S. Ct. 1495; see also Thaler v. Haynes, — U.S. —, 130 S. Ct. 1171, 1174, 175 L. Ed. 2d 1003 (2010) (accord). A state court's "unreasonable application" of law must have been more than "incorrect or erroneous;" it must have been "objectively unreasonable." Sellan, 261 F.3d at 315 (quotations and citation omitted); see also Rompilla v. Beard, 545 U.S. 374, 380, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005).

Claims that were not adjudicated on the merits in state court are not subject to the deferential standard that applies under AEDPA. See Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009) (citing 28 U.S.C. § 2254(d)). But where AEDPA's deferential standard of review does apply, the "state court's findings of fact are presumed to be correct unless the petitioner can rebut this presumption by clear and convincing evidence." Epps v. Poole, 687 F.3d 46, 50 (2d Cir. 2012), cert. denied, 133 S. Ct. 1499 (Mar. 4, 2013); see also Schriro v. Landrigan, 550 U.S. 465, 473-74, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007); Parker v. Ercole, 666 F.3d 830, 834 (2d Cir. 2012). Under AEDPA's deferential standard of review, "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a petitioner made insufficient effort to pursue in state proceedings.'" Cullen,131 S.Ct. at 1401 (quoting Williams, 529 U.S. at 437, 120 S.Ct. 1479).

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law." Swarthout v. Cooke, --- U.S. ----, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011); Wilson v. Corcoran, --- U.S. —, 131 S. Ct. 13, 16, 178 L. Ed. 2d 276 (2010).

2. Ineffective Assistance of Trial Counsel Claims

The Appellate Division's determination that petitioner's ineffective assistance of counsel

claims "are without merit," People v. White, 73 A.D.3d at 822, 900 N.Y.S.2d 407, is an

adjudication on the merits entitled to AEDPA's deferential standard of review. See Hawthorne

v. Schneiderman, — F.3d —, 2012 WL 3553364, at * 3 (2d Cir. Aug. 20, 2012) ("A summary

disposition constitutes a disposition 'on the merits[,]' entitled to deference under the AEDPA.")

"[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's

burden still must be met by showing that there was no reasonable basis for the state court to deny

relief." Harrington v. Richter, 562 U.S. ----, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011); see

also Johnson v. Williams, — U.S. —, 133 S. Ct. 1088, 1091 (2013) ("[W]hen a state court issues

an order that summarily rejects without discussion all [or some of] the claims raised by a

defendant, * * * the federal court must presume (subject to rebuttal) that the federal claim was

adjudicated on the merits." (emphasis omitted)). The Supreme Court has held that:

> "When a federal claim has been presented to a state court and the state court has
> denied relief, it may be presumed that the state court adjudicated the claim on the
> merits in the absence of any indication of state-law procedural principles to the
> contrary. * * * § 2254(d) does not require a state court to give reasons before its
> decision can be deemed to have been 'adjudicated on the merits.'"

Harrington, 131 S.Ct. at 784–785. "A state court's determination that a claim lacks merit

precludes federal habeas review so long as 'fairminded jurists could disagree' on the correctness

of the state court's decision." Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664,

124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). "Under § 2254(d), a habeas court must determine

what arguments or theories supported or * * * could have supported, the state court's decision;

and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id; see also Hawthorne, 695 F.3d at 196.

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must prove both: (1) that counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms;" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Padilla v. Kentucky, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). On habeas review of an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, 131 S.Ct. at 785; see also Santone v. Fischer, 689 F.3d 138, 154 (2d Cir. 2012), cert. denied, 133 S. Ct. 390, 184 L. Ed. 2d 231 (2012).

The AEDPA requires federal courts to give state courts "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review. Harrington, 131 S.Ct. at 786. Review of a state court's rejection of an ineffective assistance of counsel claim is "doubly deferential," Knowles v. Mirzavance, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009), i.e., the court must "take a 'highly deferential' look at counsel's performance [pursuant to] Strickland, supra, at 689, 104 S. Ct. 2052, through the 'deferential lens of § 2254(d),' [Knowles], supra, at ——, n. 2, 129 S.Ct. at 1419, n. 2." Cullen v. Pinholster, —— U.S. ——, 131 S.Ct. at 1403. Thus, in order to prevail on his ineffective assistance of counsel claim,

petitioner must demonstrate that it was "necessarily unreasonable" for the state court to conclude: "(1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the [jury's verdict and his sentence]." Cullen, 131 S.Ct. at 1403. A petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." Knowles, 556 U.S. 111, 129 S.Ct. at 1420; see also Harrington, 131 S. Ct. at 787. This presumption may only be rebutted by demonstrating that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052; see also Cornell v. Kirkpatrick, 665 F.3d 369, 377 (2d Cir. 2011) (holding that errors by counsel which violate the Sixth Amendment "include omissions that cannot be explained convincingly as resulting from a sound trial strategy but instead arose from oversight, carelessness, ineptitude, or laziness." (quotations and citations omitted)); Greiner v. Wells, 417 F.3d 305, 326 (2d Cir. 2005) ("Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude * * * Strickland's strong presumption [of effective assistance of counsel] must stand." (quotations and citation omitted)). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," Strickland, 466 U.S. at 689, 104 S. Ct. 2052; see also Morales v. U.S., 635 F.3d 39, 44 (2d Cir. 2011), cert. denied, 132 S. Ct. 562, 181 L. Ed. 2d 417 (2011), and the court should review the circumstances "from counsel's perspective at the time" of the trial. Strickland, 466 U.S. at 689; see also Raysor v. U.S., 647 F.3d 491, 495 (2d Cir. 2011). "[St]rategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable" in habeas corpus proceedings. Knowles, 129 S.Ct. at 1420, 1421 (quoting

Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

a.    Representation Before and During Trial

Petitioner contends that his trial counsel was ineffective before and during trial because

he failed to request an accomplice-corroboration charge, to argue the validity of the arrest

warrant and to call Dunn as a rebuttal witness.

Petitioner has not established that the Appellate Division's determination that his

ineffective assistance of trial counsel claims are without merit is unreasonable.  Defense counsel,

*inter alia*, delivered reasonable and cogent opening and closing arguments; effectively cross-

examined witnesses both at trial and during the pre-trial hearing; interposed timely and

reasonable objections and repeated applications for a mistrial during the trial; moved to suppress

petitioner's statements to law enforcement officers and Raza's identification of petitioner, albeit

unsuccessfully; effectively moved to preclude the admission of certain prejudicial evidence at

trial; and was successful, *inter alia*, in obtaining an acquittal on two (2) of the charges against

petitioner.  See Harrington, 131 S. Ct. at 791 ("[I]t is difficult to establish ineffective assistance

when counsel's overall performance indicates active and capable advocacy."); United States v.

DiPaolo, 804 F.2d 225, 234–35 (2d Cir.1986) (holding that defendants were not denied effective

assistance of counsel where counsel appeared well prepared and had good understanding of the

facts and legal principles involved in case); Wise v. Smith, 735 F.2d 735, 738 (2d Cir. 1984)

(finding that the petitioner was not denied the effective assistance of counsel where his defense

counsel was aggressive, well-prepared and had a good grasp of the facts and an adequate understanding of the legal principles involved, and no crucial element of defense was omitted). Petitioner has not pointed to any defect in his trial counsel's representation that fell below an objective standard of reasonableness under prevailing professional norms existing at the time of his trial and which rendered his overall performance constitutionally deficient. Accordingly, the Appellate Division's rejection of petitioner's ineffective assistance of trial counsel claims was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's ineffective assistance of trial counsel claims based upon counsel's performance before and during trial (Counts Two, Eight and Eleven) are denied.

b.      Post-Trial Representation

Petitioner alleges that his trial counsel was ineffective for failing to file a second motion to set aside the verdict after discovering James's letters.

"[T]he failure to make a meritless argument does not rise to the level of ineffective assistance." U.S. v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995); see also Bierenbaum v. Graham, 607 F.3d 36, 52 (2d Cir. 2010); Parilla v. Berle, 679 F. Supp. 2d 441, 447 (S.D.N.Y. 2010) ("A petitioner does not establish ineffective assistance where his attorney fails to advance a meritless claim.") Since, for the reasons set forth below, e.g., James's letters were not material to petitioner's guilt or innocence and would likely not have affected the verdict, a second motion to

set aside the verdict would not have been granted. Accordingly, the motion court's rejection of petitioner's ineffective assistance of trial counsel claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's ineffective assistance of trial counsel claim based upon counsel's post-trial performance (Amended Petition) is denied.

### 3. Juror Misconduct Claim

During deliberations, defense counsel advised the trial court that petitioner's mother told him that during a cigarette break she overheard juror number twelve (12) ("Juror No. 12") say to a court officer guarding her, Officer Rusch, that the jury had reached a verdict, (T1. 2260), and requested a hearing on the matter. (T1. 2261). The trial court denied the application on the basis that during an in camera conversation, at which counsel for both parties was present, Officer Rusch "adamantly denied" that any such conversation with Juror No. 12 took place. (T1. 2261-62).

Although "[t]he Sixth Amendment secures to criminal defendants the right to trial by an impartial jury," Skilling v. United States, 130 S.Ct 2896, 2912-13, 177 L. Ed. 2d 619 (2010), "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 946, 71 L. Ed. 2d 78 (1982). Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to

51

determine the effect of such occurrences when they happen." <u>Smith</u>, 455 U.S. at 217, 102 S. Ct. 940.

Upon learning of the comment purportedly made by Juror No. 12 to a court officer during a cigarette break to the effect that a verdict had been reached, the trial court questioned the officer in camera, in the presence of counsel for both parties, following which the court was satisfied that there was no misconduct. Due process requires no more, particularly absent any indication that any occurrence affected juror impartiality. Accordingly, the Appellate Division's rejection of petitioner's juror misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's juror misconduct claim (Ground Three) is denied.

      4.    James's Comment on Cross-Examination

During defense counsel's cross-examination of James, the following exchange occurred:

> Q.    How long after you are in the police station do you bring up the topic of the incident involving my client [petitioner] or that you say involves my client?
>
> A.    When I realize your client and his friends tried to kill me earlier that morning.
>
> Q.    That's when you implicate my client in the murder?
>
> A.    That's when I decide to give your client up.
>
> Q.    Well, you indicate that there – you indicated at some point there was a poppy on the gun, but it wasn't mine?

A.     I said that.

(T1. 1952-53). The prosecutor then asked to approach and a discussion was held outside the

jury's presence during which the trial court indicated that James's response to defense counsel's

question was not responsive. (T1. 1953). The prosecutor responded that defense counsel had

explored the issue of James's motivation for turning the petitioner in; that "whether or not that

question [sic] was nonresponsive is immaterial" since defense counsel was "not speaking to a

trained witness; and that James was told by the prosecution to stay away from the history

between himself and petitioner, including any prior crimes that they were involved in or that he

observed petitioner involved in, one of which was the incident that had occurred that morning,

i.e., the Blanton shooting. (T1. 1953-54). The prosecutor noted that he had avoided questioning

James about the fact that Blanton is petitioner's cousin and that petitioner had been present

during the Blanton incident during direct examination and had even "stipulated that [petitioner]

was not one of the people involved in the altercation that night, which, in fact, is a fiction." (T1.

1954). Defense counsel moved for a mistrial on the basis that James's testimony was

nonresponsive. (T1. 1955-56). The trial court denied the application for a mistrial, indicated that

it would instruct the jury "to disregard that last question and last response by * * * [James] * *

*," and advised defense counsel "to be careful in the area that you go into at this point * * *."

(T1. 1956). The trial court then instructed the jury that "the last question and last response

should be disregarded with respect to this case, as it's not evidence in this case." (T1. 1960).

Following a lunch break, defense counsel renewed his application for a mistrial on the basis that

James's nonresponsive answer was prejudicial to petitioner. (T1. 1961-67). The trial counsel

53

again denied the application. (T1. 1967-68).

The Appellate Division found: (1) that the trial court "providently exercised its discretion in denying [petitioner's] request for a mistrial after [James] gave an unresponsive answer during cross-examination which suggested [petitioner's] involvement in an uncharged crime;" and (2) that the trial court's "curative instruction was sufficient to ameliorate any prejudice and to ensure that [petitioner] received a fair trial." People v. White, 73 A.D.3d at 821, 900 N.Y.S.2d 407.

Since the inadvertent and isolated statement by James had been elicited by defense counsel on cross-examination and was but one (1) remark during a long trial, and the trial court instructed the jury to disregard the statement "as it's not evidence in th[e] case," (T1. 1960), the fleeting reference to petitioner's participation in the uncharged Blanton shooting did not deprive petitioner of a fair trial, particularly since the admissible evidence of petitioner's guilt was substantial. See, e.g. United States v. Hinton, 543 F.2d 1002, 1015 (2d Cir. 1976) (finding that an inadvertent and isolated comment by a prosecution witness during cross-examination did not deprive the defendant of a fair trial); United States v. Gorman, 355 F.2d 151, 153-54 (2d Cir. 1965) ("Refusal to order a mistrial for admitting evidence of a crime not charged in the indictment has been held not to require reversal when the error was inadvertent and the other evidence of guilt was so strong that it is unbelievable that a rational jury would have acquitted if this error had not occurred." (quotations and citation omitted)); United States v. Vita, 294 F.2d 524, 527 (2d Cir. 1961) (holding that one fleeting reference by a prosecution witness during cross-examination by defense counsel that implicated the defendant in an uncharged crime did not warrant a mistrial where the trial court instructed the jury to disregard the statement as having

54

"nothing at all to do with this case" and the admissible evidence of the defendant's guilt was substantial); United States v. Stromberg, 268 F.2d 256, 269 (2d Cir. 1959) (finding that the trial court's prompt instruction to the jury to disregard an unforeseeable and isolated response by a prosecution witness during cross-examination by defense counsel cured any prejudice to the defendant); United States v. Giallo, 206 F.2d 207, 209 (2d Cir. 1953) (finding no error in the trial court's denial of the defendant's motion for a mistrial based upon a prosecution witness's unresponsive answer on cross-examination that suggested the defendant's participation in an uncharged crime where the trial court had instructed the jury to disregard the statement). Accordingly, the Appellate Division's rejection of petitioner's claim based upon James's unresponsive answer during cross-examination was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's claim based upon James's unresponsive answer on cross-examination (Ground Four) is denied.

### 5. Prosecutorial Misconduct Claims

Prosecutorial misconduct violates a defendant's constitutional rights only when it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); see also U.S. v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002). To determine whether a prosecutor deprived a petitioner of a fair trial, a court must consider (1) the severity of the misconduct; (2) the measures

adopted by the trial court to cure the misconduct; and (3) the certainty of a conviction absent the misconduct. See U.S. v. Burden, 600 F.3d 204, 221-22 (2d Cir. 2010); U.S. v. Thomas, 377 F.3d 232, 245 (2d Cir. 2004).

### a.  Prosecutor's Comment on Summation

During his summation, (T1. 2151-), the prosecutor made the following comment:

> "What else do they know? Well, there are two people on the walkway; black, hooded sweatshirt, black or blue jeans, the closest one. Now that's Jose Rosales' position to make."

(T1. 2153). Defense counsel objected to that comment, and moved for a mistrial, on the basis that it made "it appear * * * that the detective actually got the information [that there were two (2) subjects] from Mr. Rosales, which we know not to be true, not only from the stipulation which was entered, be [sic] we know this from day one, supposedly. That's how the comment came out. We know that's not true. * * *" (T1. 2180-81). The trial court denied the application for a mistrial. (T1. 2181).

On appeal, the Appellate Division rejected petitioner's claim that the prosecutor's comment during summations deprived him of a fair trial, finding that "the prosecutor's isolated misstatement on summation did not constitute prejudice sufficient to require reversal." People v. White, 73 A.D.3d at 822, 900 N.Y.S.2d 407.

In order to grant habeas relief based upon a prosecutor's comments during trial, the court must find that the comments "constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights." Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998). The petitioner must show "that he suffered actual prejudice because the

prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Id. (quotations and citation omitted). Thus, the petitioner must show both that the prosecutor's comments were improper and "that the remarks, taken in the context of the entire trial, resulted in substantial prejudice." Thomas, 377 F.3d at 244 (quotations and citations omitted). The prosecutor's comments must be examined "in the context of the trial and the summation in its entirety." Id.; see also Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003).

Given the isolated nature of the challenged comment, and the fact that the trial court instructed the jury not to consider counsels' summations as evidence, (see T1. 2183), the prosecutor's misstatement was not sufficiently significant in the context of the entire trial to have denied petitioner due process. See, e.g. Donnelly v. DeChristoforo, 416 U.S. 637, 646, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("The consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a mater of opinion not of evidence, do not reach the same proportions.") (internal quotation marks omitted); Tankleff, 135 F.3d at 253 (holding that the "short and fleeting" comments made by the prosecutor were "less likely to have had a substantial effect on the jury's verdict" and that the trial court's standard instruction, *inter alia*, that the attorneys' arguments on summation are not evidence was "probably sufficient to cure any harm that the prosecutor's misstatements may have caused.") Accordingly, the Appellate Division's rejection of petitioner's claim challenging the prosecutor's isolated comment on summation was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's claim based upon the prosecutor's comment on summation (Ground Nine) is denied.

### b. Claims Raised in Amended Petition

Initially, I reject respondent's contention that petitioner's prosecutorial misconduct claims in the amended petition, i.e., his claims that his judgment of conviction was procured by misrepresentation and fraud, that material evidence introduced at his trial was false and that improper and prejudicial conduct not appearing on the record occurred during the trial, are procedurally barred from federal habeas review because the motion court denied those claims pursuant to Section 440.30(4)(b) of the New York Criminal Procedure Law.[6] Although there is split in authority in this Circuit as to whether Section 440.30(4)(b) of the New York Criminal Procedure Law constitutes an independent and adequate state procedural rule sufficient to preclude federal habeas review, compare Giraldo v. Bradt, No. 11-cv-2001, 2012 WL 3835112, at * 8-9 (E.D.N.Y. Sept. 5, 2012) (holding that Section 440.30(4)(b) cannot serve as a procedural bar to federal habeas review); Parker v. Smith, 858 F. Supp. 2d 229, 236 (N.D.N.Y. 2012) (same); Williams v. Duncan, No. 9:03cv568, 2007 WL 2177075, at * 13 (N.D.N.Y. July 27, 2007) (same), Gonzalez-Pena v. Herbert, 369 F. Supp. 2d 376, 388-89 (W.D.N.Y. 2005) (same); with Williams v. McGinnis, No. 04-cv-1005, 2006 WL 1317041, at * 10 (E.D.N.Y. May 15,

---

[6] Section 440.30(4) provides that "[u]pon considering the merits of the motion [to vacate a judgment of conviction and set aside the sentence], the court may deny it without conducting a hearing if: * * * (b) The motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts * * *."

2006) (finding that Section 440.30(4)(b) foreclosed federal habeas review), I concur with the reasoning of the majority of cases holding that Section 440.30(4)(b) cannot serve as a procedural bar to federal habeas review, particularly in light of the Second Circuit's decision in Garcia v. Portuondo, 104 Fed. Appx. 776, 779 (2d Cir. July 19, 2004) (summary order), holding that Section 440.30(4)(c) of the New York Criminal Procedure Law, which contains similar relevant language to Section 440.30(4)(b), does not serve as a procedural bar to federal habeas review.[7] Accordingly, I will address the merits of petitioner's prosecutorial misconduct claims.

"The Supreme Court analyzes claims for wrongful conviction based on perjured testimony under the Due Process Clause of the Fourteenth Amendment." Drake I, 321 F.3d at 344-45 (citing Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)). "To successfully challenge a conviction based upon the prosecutor's alleged use of perjured testimony, the petitioner has the burden of demonstrating, by a preponderance of evidence, that false testimony was given; in determining whether perjury occurred, a court must 'weigh all the evidence of perjury before it.'" Garner v. Superintendent of Upstate Correctional Facility, No. 9:01cv0501, 2007 WL 2846907, at * 21 (N.D.N.Y. Sept. 26, 2007) (quoting Ortega v. Duncan, 333 F.3d 102, 106-07 (2d Cir. 2003)).

"[A] showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief." Ortega, 333 F.3d at 108. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Drake v.

_____

[7] The district court in McGinnis, 2006 WL 1317041, at * 10, made no reference to Garcia or any case explicitly addressing Section 440.30(4)(b) of the New York Criminal Procedure Law.

Portuondo ("Drake II"), 553 F.3d 230, 241 (2d Cir. 2009) (quoting United States v. Agurs, 427

U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)). Thus, a conviction "must be set aside if

(1) the prosecution actually knew of [a witness's] false testimony, and (2) there is any reasonable

likelihood that the false testimony could have affected the judgment of the jury." Drake II, 553

F.3d at 241.

On the other hand, "[w]here the government is unaware of witness perjury at the time of

trial, a federal habeas petitioner must establish that the perjured testimony was material, in which

case habeas relief is warranted if 'the court is left with a firm belief that but for the perjured

testimony, he * * * would most likely not have been convicted.'" Drake II, 553 F.3d at 241

(quoting Fama v. Commissioner of Correctional Services, 235 F.3d 804, 816 (2d Cir. 2000))

(alterations omitted); see also Ortega, 333 F.3d at 108. "In circumstances where a petitioner

alleges that a witness has recanted his or her testimony, a petitioner must demonstrate that the

recantation was reliable and that the elimination of the perjured testimony would probably result

in an acquittal or a retrial." Garner, 2007 WL 2846907, at * 22.

Since "AEDPA * * * requires federal habeas courts to presume the correctness of state

courts' factual findings unless applicants rebut th[at] presumption with 'clear and convincing

evidence,'" Schriro, 550 U.S. 465, 473-74, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (quoting

28 U.S.C. § 2254(e)(1)); see also Rice v. Collins, 546 U.S. 333, 339, 126 S. Ct. 969, 163 L. Ed.

2d 824 (2006) ("State-court factual findings * * * are presumed correct; the petitioner has the

burden of rebutting the presumption by 'clear and convincing evidence.'"), the motion court's

finding that petitioner's prosecutorial misconduct claims lack factual merit is presumptively

correct, see, e.g. Metts v. Miller, 995 F. Supp. 283, 296-97 (E.D.N.Y. 1997), and petitioner has

neither rebutted that presumption nor demonstrated that the motion court's finding is unreasonable. The record establishes that petitioner's conviction was not the product of fraud, duress, misrepresentation or other misconduct on the part of the prosecution, trial court, or anyone acting for or on their behalf. Petitioner has not rebutted the presumption of correctness that applies to the motion court's factual findings since, *inter alia*, there is no evidence, much less clear and convincing evidence, that James actually committed perjury, i.e., that his testimony regarding petitioner's participation in the Benitez homicide was false, or was encouraged to do so. Although petitioner claims that James felt pressured to plead guilty to the charges against him and to "give up" petitioner, there is no evidence that any statements James made implicating petitioner in the crimes with which he was charged were false.

Moreover, petitioner has not established that the prosecution knew, or should have known, that James's testimony was allegedly false, or that there is a reasonable probability that the outcome of the trial would have been different absent James's testimony since, *inter alia*, there was substantial evidence of petitioner's guilt outside of James's testimony, including petitioner's oral and written statements to law enforcement officials, the ballistic evidence and the testimony of other witnesses. Accordingly, the motion court's rejection of the prosecutorial misconduct claims petitioner raises in his amended petition was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's prosecutorial misconduct claims in his amended petition are denied.

6.    Brady Claim

On cross-examination, Dunn testified that she described the man she saw outside her window to a detective as being of average height, even though the canvass sheet from that detective, which was not written or signed by Dunn, indicated that she had described the individual as "a short thin male." (T1. 1353-54). On redirect examination, Dunn testified that she eventually made and signed a written statement. (T1. 1354). Defense counsel denied ever receiving a copy of Dunn's written statement, demanded a copy of the statement and moved to strike Dunn's testimony on the basis that the defense was prejudiced by the failure to produce Dunn's statement prior to trial because he would have cross-examined Dunn differently had he known of the written statement. (T1. 1355-60). The trial court denied defense counsel's application, directed that the statement be produced to defense counsel, adjourned the trial until the following day, permitted defense counsel to immediately reopen his cross-examination of Dunn and offered to give a curative instruction to the jury. (T1. 1360-61). Prior to reopening the cross-examination of Dunn, the trial court advised the jury that defense counsel was "being permitted to reopen cross-examination due to the fact he was provided with a statement yesterday that he was previously unaware of." (T1. 1375).

Upon the reopened cross-examination, Dunn testified that she used the word "average", not "short," to describe the man she saw out her window to the detective on the day of the murder. (T1. 1376-77). When she gave a statement to Re on May 24, 2006, approximately six (6) months later, she described the man as someone of average height who was wearing loose blue jeans. (T1. 1377-79).

The Appellate Division found that petitioner "was not prejudiced by the prosecutor's late

62

disclosure of a witness's statement because, upon being informed of the error, the Supreme Court

ordered the prosecutor to provide the statement, instructed the jury to disregard the witness's

prior testimony, and gave the defense an opportunity to re-open cross-examination." People v.

White, 73 A.D.3d at 822, 900 N.Y.S.2d 407.

To the extent that petitioner raises a claim for a violation of People v. Rosario, 9 N.Y.2d

286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961), that claim fails because the obligation to turn

over Rosario material arises under state law and federal habeas review lies only to remedy

violations of federal law.  See Landy v. Costello, 141 F.3d 1151, 1998 WL 105768, at * 1 (2d

Cir. Mar. 9, 1998) (summary order); Perez v. Smith, 791 F. Supp. 2d 291, 311 (E.D.N.Y. 2011)

(holding that a Rosario violation "rests exclusively on state criminal procedure law grounds and

is not cognizable on habeas review."); Reynoso v. Artus, 722 F. Supp. 2d 394, 403 (S.D.N.Y.

2010) (accord).  Accordingly, any such claim is dismissed.

To the extent petitioner raises a claim for a Brady violation, "[t]here are three components

of a true Brady violation: The evidence at issue must be favorable to the accused, either because

it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the

State, either willfully or inadvertently; and prejudice must have ensued." Boyette v. Lefevre, 246

F.3d 76, 89 (2d Cir. 2001).  When a Brady violation claim is based upon the late disclosure, as

opposed to the nondisclosure, of evidence, reversal is not warranted unless the defendant "can

show that the delayed disclosure caused him prejudice." United States v. Diaz, 922 F.2d 998,

1007 (2d Cir. 1990); see also Lyon v. Senkowski, 109 F. Supp. 2d 125, 138 (W.D.N.Y. 2000).

Even assuming, *arguendo*, that Dunn's statement is favorable to petitioner, for purposes

of impeachment, and was suppressed by the prosecution, petitioner was not prejudiced by the late

disclosure of such statement in light of the trial court's instructions to the jury, the continuance of the trial and defense counsel's opportunity to re-open the cross-examination of Dunn, i.e. to effectively use Dunn's statement upon cross-examination. Under the circumstances of this case, there is no reasonable probability that the prosecution's late disclosure of Dunn's statement affected the outcome of petitioner's case. See United States v. Rittweger, 524 F.3d 171, 182-83 (2d Cir. 2008). Accordingly, the Appellate Division's rejection of petitioner's Brady violation claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's Brady violation claim (Ground Ten) is denied.

### 7. Right to Be Present Claim

Petitioner contends that he was denied his right to be present at a material stage of trial when the trial court conducted an in camera discussion with Officer Rusch during jury deliberations outside his presence.

The Appellate Division found that petitioner's "right to be present at a material stage of the trial was not violated when, in the presence of [defense] counsel, the [trial court] conducted an in camera questioning of a court officer * * *." People v. White, 73 A.D.3d at 821, 900 N.Y.S.2d 407.

A criminal defendant's right to be present at trial is rooted in the Confrontation Clause of the Sixth Amendment which guarantees the defendant the right to be present at trial to confront the witnesses and evidence against him. U.S. v. Tureseo, 566 F.3d 77, 83 (2d Cir. 2009) (citing United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985)); see also

64

Grayton v. Ercole, 691 F.3d 165, 170 (2d Cir. 2012). "[T]his right to be present has been extended to other critical stages of trial beyond those related to the defendant's rights to confronting witnesses and evidence." Tureseo, 566 F.3d at 83.

A defendant "has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Id. (internal quotations omitted). See e.g., Faretta v. California, 422 U.S. 806, 819 n. 5, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) ("A criminal defendant has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings"); United States v. Rivera, 22 F.3d 430, 438 (2d Cir.1994) ("The Due Process Clause only guarantees a defendant the right to be present at a given stage of his trial to the extent that a fair and just hearing would be thwarted by his absence") (internal quotations omitted)). "[T]he constitutional right to be present at one's own trial exists 'at any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure.'" Tureseo, 566 F.3d at 83 (quoting Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)).

Any error in conducting proceedings in the defendant's absence is reviewed for harmlessness, i.e., "whether the error 'created any reasonable probability of prejudice.'" Tureseo, 566 F.3d at 84 (quotations and citation omitted); United States v. Toliver, 541 F.2d 958, 965 (2d Cir.1976) (holding that test for harmlessness turns on whether the error "created any reasonable possibility of prejudice"); Stincer, 482 U.S. at 745730, 745, 107 S. Ct. 2658 (holding that right to be present is not guaranteed "when presence would be useless, or the benefit but a shadow" (internal citation and quotation marks omitted)). A defendant's right to be present does

not extend to instances in which the defendant "could have done nothing had he been [present], nor would he have gained anything by attending." Gagnon, 470 U.S. at 526-27; Grayton, 691 F.3d at 170.

The in camera questioning of Officer Rusch, outside petitioner's presence, without more, did not violate petitioner's constitutional rights since, *inter alia,* petitioner has not demonstrated how his presence during that questioning would have benefitted his defense, nor that his absence compromised the fairness of the trial. See, e.g. Gagnon, 470 U.S. at 527; United States v. Peterson, 385 F.3d 127, 138 (2d Cir. 2004). Accordingly, the Appellate Division's rejection of petitioner's right to be present claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's right to be present claim (Ground Twelve) is denied.


8.    Newly Discovered Evidence Claim

"A claim based on newly discovered evidence has never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Ortega, 333 F.3d at 108 (quotations, alterations and citation omitted). "In order for habeas relief to issue, then, a due process violation must have occurred at [petitioner's] trial." Id. The issue is "whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness." Ortega, 333 F.3d at 109 (quotations and citation omitted). The court must consider

66

"whether there was a significant chance that th[e] [newly discovered evidence], developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Id. (quotations and citation omitted).

Under the circumstances of this case, there is no significant chance that the jury in petitioner's trial would have been sufficiently affected by the newly-discovered evidence, i.e., James's letters, as to have had reasonable doubt that petitioner committed Benitez's attempted robbery and murder. Accordingly, the motion court's rejection of petitioner's newly discovered evidence claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's newly discovered evidence claim (Amended Petition) is denied.

IV. CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is denied and the proceeding is dismissed in its entirety. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); Contino v. United States, 535 F.3d 124, 127 (2d Cir. 2008). Petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253.

The Clerk of the Court shall enter judgment in favor of respondent, close this case, and

serve notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to petitioner at his last known address. See Fed. R. Civ. P. 5(b)(2)(c).

SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: Central Islip, New York
      April 22, 2013