SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

-against-

JOHN WHITE,

                                    Defendant.

-------------------------------------------------------------------X

**AFFIRMATION AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO VACATE JUDGMENT**

Ind. No.:   1596N-2006
Court No.:  Ind. 70014-06
Motion No.: C-160
Hon. Terence P. Murphy
Returnable:  March 4, 2024

BARBARA KORNBLAU, an attorney duly admitted to practice law in the State of New York, affirms the following under the penalty of perjury:

1.      I am an assistant district attorney, of counsel to Anne T. Donnelly, District Attorney of Nassau County, and I submit this affirmation in opposition to defendant's motion to vacate judgment pursuant to C.P.L. § 440.10.

2.      The following statements are made upon information and belief, based upon defendant's motion papers, and the records of the Nassau County District Attorney's Office.

3.      On October 22, 2005, one month after defendant was released from prison on an unrelated matter, he, and codefendant Keith James, while armed with a loaded firearm, attempted to rob twenty-four-year-old Jose Benitez.  Benitez resisted, was shot, and killed.

4.      Defendant and Keith James were indicted for murder in the second degree (Penal Law § 125.25[3]) (felony murder); attempted robbery in the first degree (Penal Law §§ 110.00/160.15[2]); attempted robbery in the second degree (Penal Law §§ 110.00/160.10[1]); criminal possession of a weapon in the second degree (Penal Law

**ATTACHMENT 2**

§ 265.03[2]); and criminal possession of a weapon in the third degree (Penal Law § 265.02[4]). Defendant was individually indicted for criminal possession of a controlled substance in the fifth degree. This charge was severed for trial and was subsequently dismissed after defendant's conviction on other charges.

5.    Keith James entered into a plea agreement in accord with which he agreed to testify against defendant.

6.    After a jury trial, where the evidence included both defendant's admissions to the police and codefendant James's testimony, defendant was convicted of murder in the second degree (felony murder), attempted robbery in the first degree, and attempted robbery in the second degree. He was acquitted of criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. The court sentenced defendant to concurrent terms of imprisonment, the longest of which was twenty-five years to life.

7.    Prior to sentencing, defendant filed a motion to set aside the verdict pursuant to C.P.L. § 330.30(2) on the ground of juror misconduct and on his claim that the verdict was repugnant. The motion was denied in its entirety (Brown, J., November 29, 2007).

The Direct Appeal

8.    Defendant appealed to the Appellate Division, Second Department, where his attorney filed a seven-point brief. Defendant was granted permission to file a pro-se supplemental brief, which he filed, and in which he raised five additional points. A unanimous panel of the Appellate Division rejected all of defendan"s claims as unpreserved and/or

2

**ATTACHMENT 2**

meritless. *People v. White*, 73 A.D.3d 820 (2d Dept. 2010). Defendant sought leave to appeal to the Court of Appeals, which was denied. *People v. White*, 15 N.Y.3d 779 (2010).

<u>Defendant's First Motion To Vacate Judgment</u>

9.      While his direct appeal was pending, defendant filed a motion to vacate the judgment of conviction, raising five claims. Defendant's claims relied on three letters allegedly written by codefendant Keith James. Two of the letters were addressed to Judge William Donnino, and one was addressed to William Petrillo, James's attorney. Defendant argued that these letters constituted newly discovered evidence, which he claimed established that his judgment was procured by fraud and duress.

10.     In a ten-page decision dated June 11, 2010, the court denied defendant's motion on both procedural and substantive grounds. The court determined that the letters submitted by defendant in support of his motion did not establish that James testified falsely and that they did not constitute newly discovered evidence because they were not material to the issues presented at trial and would not likely change the result if a new trial were granted. Indeed, the court determined that the statements set forth in James's letters went only to the nature of James's plea, which James subsequently acknowledged in court was voluntary, and that none of the letters indicated that James had testified falsely in defendant's case. Moreover, the court determined that defendant's conviction was supported by substantial evidence, and did not rest upon James's testimony (Ayres, J., June 11, 2010).

11.     On July 21, 2010, defendant filed a motion with the Appellate Division, seeking leave to appeal the denial of his motion to vacate. By order dated February 15, 2011, the

**ATTACHMENT 2**

Appellate Division denied the motion, and by order dated May 26, 2011, the Appellate Division denied defendant's motion for leave to appeal to the Court of Appeals from its February 9, 2011, order.

Federal Habeas Corpus Petition

12.     On November 5, 2010, defendant sought federal habeas corpus relief, raising twelve claims, and seeking discovery in an attempt to establish that his judgment of conviction was procured through the false testimony of Keith James.  Although defendant did not initially renew any of the claims raised in his C.P.L. § 440 motion, he later sought, and was granted, leave to file an amended petition to include the claims raised in his C.P.L. § 440 motion.

13.     By Opinion and Order of the Honorable Sandra J. Feuerstein, United States District Judge, dated April 22, 2013, defendant's petition was denied in its entirety.  Judge Feuerstein held that defendant's discovery demands were overly broad and largely irrelevant, and that defendant made no showing that the discovery requested would support any of the claims in his habeas petition.  *White v. Rock*, 2013 WL 1767784 at *18 (April 22, 2013).  With regard to defendant's newly-discovered-evidence claim (the three letters allegedly authored by Keith James), the Court held that there was no significant chance that the jury would have been sufficiently affected by this evidence so as to have had a reasonable doubt that defendant committed the crimes.  *Id.* at *35.

14.     Defendant thereafter sought reconsideration on the merits pursuant to Federal Rules of Civil Procedure 60(b).  Defendant's application was denied.  *White v. Rock*, 2014 WL 1315338 (March 27, 2014).  Defendant appealed the court's order and sought an order to

4

**ATTACHMENT 2**

compel the production of transcripts from his trial.  On March 5, 2015, the United States Court of Appeals for the Second Circuit issued a mandate, denying defendant's motion to compel production of the trial transcripts and denying defendant's motion for a certificate of appealability as to the District Court's denial of his habeas petition.

Petition For a Writ of Error Coram Nobis

15.    On November 5, 2010 (while defendant's petition for a federal writ of habeas corpus and his state leave application to appeal the denial of his C.P.L. § 440 motion were still pending), defendant filed an application for a writ of error coram nobis, claiming that his appellate counsel was ineffective.  By order dated June 28, 2011, defendant's application was unanimously denied by the Appellate Division. *People v. White*, 85 A.D.3d 1205 (2d Dept. 2011).

Additional Motions

16.    Defendant has filed a plethora of additional motions with this Court which, although not entitled 440 motions, sought vacatur as well as various other forms of relief and requested that he be provided with certain documents.  All of his motions have been denied.

17.    On or about September 18, 2014, defendant sent a letter to then District Attorney Kathleen Rice.  The letter contained a transcript of a recording of an alleged conversation between defendant's brother, Felix White, and Keith James.  This was the same transcript defendant relied on in a motion defendant submitted to the court which he claimed constitutes newly discovered evidence which he asked to have "authenticated."  This motion was denied by the court (Ricigliano, J., April 2, 2018).

**ATTACHMENT 2**

18.     Upon receiving defendant's letter, Executive Assistant District Attorney Sheryl Anania conducted a comprehensive review regarding the integrity of defendant's conviction. In a letter dated November 17, 2014, Ms. Anania advised defendant that she had reviewed his claims, ordered, and reviewed transcripts referred to in his letters, reviewed transcripts submitted by defendant, and reviewed all prior motions, briefs and petitions filed in this case. She concluded that there was nothing contained in the transcript of the recording that was material to the integrity of defendant's conviction.  Ms. Anania pointed out that on the recording that defendant submitted, Keith James reiterated that defendant was the individual who had murdered Mr. Benitez, and that James had stood by that statement for the previous eight years.  She further advised defendant that none of the letters he provided in his previous motions had varied from that account.  She concluded that the matter did not merit further investigation, and that she was closing the investigation into the integrity of his conviction.

19.     Additionally, defendant has filed at least eight Freedom-of-Information-Law requests with the District Attorney's Office, and has sent roughly 100 letters, motions and notices requesting various documents and requesting that the District Attorney conduct investigations and indict prosecutors, including the trial assistant, the trial assistant's supervisor, and the appellate attorneys who handled his appeal on behalf of the District Attorney's Office.  Reviews of defendant's prosecution were conducted by various supervisors in the District Attorney's Office and defendant's claims were determined to be unfounded.

**ATTACHMENT 2**

<u>Federal Motions</u>

20.    In addition to numerous motions to the County Court, and numerous petitions, motions, and letters to the United States District Court for the Eastern District of New York, defendant filed numerous appeals and motions with the United States Court of Appeals for the Second Circuit, as well as a petition for certiorari to the United States Supreme Court.  All have been denied or dismissed.  A copy of defendant's PACER (Public Access to Court Electronic Records) printout and any or all specific filings will be provided to the Court upon request.

<u>Defendant's Application For Resentencing Pursuant to C.P.L. § 440.47</u>

21.    On May 20, 2022, defendant filed a motion with this Court for resentencing under the Domestic Violence Survivors Justice Act ("DVSJA").  *See* C.P.L. § 440.47.  Contrary to defendant's vehement, repeated, and voluminous claims of innocence, defendant argued that at the time he murdered Mr. Benitez, he was a victim of domestic violence subjected to sexual or psychological abuse inflicted by a member of his family or household and that such abuse was a significant contributing factor to defendant's commission of the murder.  *See* C.P.L. § 440.47(2)(c).  Defendant alleged that he was subjected to sexual abuse by his uncle when he was four or five years old.  He further claimed that this alleged abuse contributed to his commission of the murder of Benitez—eighteen years later.

22.    In a Decision and Order dated June 22, 2022, the Supreme Court (Robbins, J.), summarily denied defendant's motion for resentencing, finding that defendant had failed to meet the statutory requirements necessary to order a hearing in that he failed to include "at

7

**ATTACHMENT 2**

least two pieces of evidence corroborating [his] claim that he was, at the time of the offense, a victim of domestic violence subjected to substantial physical, sexual or psychological abuse," as required under C.P.L. § 440.47(2)(c).  *See* court decision at page 4.[1]  The court further determined that, based on his application, defendant had failed to establish that the alleged abuse was a significant contributing factor to his criminal behavior, nor did he outline any nexus between the alleged abuse and the crime (Penal Law § 60.12[1][a][b]).  *See* court decision at pages 4-5.

23.    Defendant has appealed the court's decision to the Appellate Division, Second Department.  The People submitted its brief in opposition to defendant's appeal.  The Appellate Court's decision is currently pending.

### Defendant's Current Motion

24.    Now, more than sixteen years after his conviction, defendant seeks again to vacate his judgment of conviction, arguing that (1) the Grand Jury proceeding was defective for a variety of reasons; (2) the People committed various *Rosario* and *Brady* violations at trial; (3) the People submitted false information to the Appellate Division by mistakenly referring to Jose Rosales as Caesar Jiminez; and (5) defense counsel was ineffective for a variety of reasons.  *See* defendant motion at pages 36-37.

25.    As set forth more fully in the attached memorandum of law, defendant's motion should be summarily denied.  Defendant is precluded from challenging the sufficiency of the

---

[1] A copy of the court's decision will be provided to this Court upon request.

**ATTACHMENT 2**

evidence before the Grand jury as he was convicted at trial upon legally sufficient evidence. *See* C.P.L. § 210.30(6).  Further, the majority of defendant's claims are procedurally barred because defendant either raised them on appeal or failed to raise them despite the fact that they were fully reviewable from the record.  *See* C.P.L. § 440.10(2)(a), (c).  In addition, defendant's claims should be denied because they are entirely unsupported by sworn allegations substantiating the facts underlying those claims.  *See* C.P.L. §440.30(4)(b)-(d). Moreover, the Court may deny the bulk of defendant's motion because defendant could have raised his arguments in his previous C.P.L. § 440.10 motion but failed to do so.  C.P.L. § 440.10 (3)(c).  Finally, all of defendant's claims are simply meritless.

WHEREFORE, defendant's motion to vacate his judgment of conviction should be summarily denied.

Dated:   Mineola, New York
          February 29, 2024

Barbara Kornblau

9

**ATTACHMENT 2**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

                            -against-

JOHN WHITE,

                                 Defendant.
------------------------------------------------------------------------X

Ind. No. 1596N-2006
Court No. Ind. 70014-06
Motion No. C-160
Hon. Terence P. Murphy
Returnable:  March 4, 2024

<u>MEMORANDUM OF LAW</u>

Respectfully submitted,

ANNE T. DONNELLY
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
(516) 571-3660

Judith R. Sternberg
Barbara Kornblau
  Assistant District Attorneys
    *of Counsel*

**ATTACHMENT 2**

## INTRODUCTION

In the early morning of October 22, 2005, Jose Benitez walked to a neighborhood bodega.  Defendant and his friend, codefendant Keith James, were parked outside the bodega, looking for someone to rob.  As Benitez left the bodega with a case of beer, defendant followed him on foot, and Keith James circled around the block in the car.  Defendant approached Benitez and demanded money.  Benitez resisted and the two began struggling.  James got out of his car and, although he had a pronounced limp, he ran, as best as he could, to help defendant.  Defendant fired three shots at Benitez, who turned and ran from defendant and James.

Jose Rosales, Benitez's cousin, was in his car, outside Benitez's apartment, waiting for Benitez to return, when he heard a gunshot.  He looked up and saw his cousin clutching his stomach and staggering toward him.  He heard two additional shots.  By the time he reached his cousin, Benitez had collapsed to the ground.  An ambulance arrived within minutes and transported Benitez to the hospital, where he was pronounced dead.

Defendant and codefendant James were indicted for murder in the second degree (Penal Law § 125.25[3]) (felony murder); attempted robbery in the first degree (Penal Law §§ 110.00/160.15[2]); attempted robbery in the second degree (Penal Law §§ 110.00/ 160.10[1]); criminal possession of a weapon in the second degree (Penal Law § 265.03[2]); and criminal possession of a weapon in the third degree (Penal Law § 265.02[4]).  Defendant was individually indicted for criminal possession of a controlled substance in the fifth degree (Penal Law § 220.06[5]).  Prior to trial, count six of the indictment, charging criminal possession of a

1

**ATTACHMENT 2**

controlled substance in the fifth degree, was severed for trial.  James entered into a plea agreement in accord with which he agreed to testify against defendant.

After a jury trial, defendant was convicted of murder in the second degree, attempted robbery in the first degree, and attempted robbery in the second degree and was sentenced to concurrent terms of imprisonment, the longest of which was a maximum indeterminate term of twenty-five years' to life imprisonment.

Now, more than fifteen years after his conviction, defendant argues that his conviction should be vacated because the grand jury proceeding was defective, the People withheld *Brady* and *Rosario* material, and because his attorney was ineffective.  He also asserts that the People provided false information in its brief to the Appellate Division.  These claims are forfeited, procedurally barred, and entirely meritless.

## STATEMENT OF FACTS

### The Trial

#### The People's Case [1]

Defendant had been released from prison only one month when he and Keith James drove around the streets of Hempstead on October 22, 2005, looking for someone to rob. Defendant was armed with a gun that he had borrowed from James two weeks earlier.  James parked in front of the Stop and Shop bodega, a small convenience store, and defendant, who

---

[1] Numbers in parentheses refer to the minutes of the trial.  Names preceding the numbers refer to the witnesses whose testimony is cited.

2

**ATTACHMENT 2**

was seated in the passenger seat, looked for a victim as the customers came out of the bodega. (James: 1756-63). Syed Raza, the night cashier at the bodega, knew both James and defendant. While he knew James by name, he knew defendant only by a nickname. Over the past six or seven years, Raza had seen defendant in the bodega several times a week. However, he had not seen defendant for about two or three years when defendant came into the bodega in early October. At that time, Raza asked defendant where he had been, and defendant replied that he had been in jail.

On October 22, 2005, Raza left the store at about 6:30 a.m. He saw defendant and Keith James outside of the bodega. Raza approached the car to say hello (Raza: 836-69, 934-36). A video surveillance tape showed that just as Raza was leaving the bodega, twenty-six-year-old Jose Benitez entered the bodega. Benitez, who lived down the block, came to the bodega to buy beer. His cousin, Jose Rosales, and two other relatives, remained in the car down the block, just outside of Benitez's apartment building (Rosales: 1023-47). Benitez left the bodega after about one minute. He was holding a case of beer in his hands.

When Benitez left the store, defendant nodded to James to signal that he was going to follow him, and he began following Benitez on foot. Defendant wore a black hooded jacket which was open in the front, and he held something in his right hand, inside the left side of his jacket (Raza: 850-53, 936). Defendant followed Benitez, walking south down the side street (Hendrickson) and James, who remained in the car, drove around the block toward Hendrickson in the opposite direction. When he arrived at the corner of Devon and Hendrickson, James saw defendant struggling with Benitez. (Raza: 850-54, 936; James 1764-67). He parked at the corner, got out of the car, and ran over to assist defendant. As he

**ATTACHMENT 2**

approached defendant and Benitez—who were struggling in front of a white picket fence located on the side of 60 Hendrickson Street—James heard a shot go off and he heard Benitez scream. Benitez ran along the white fence with defendant chasing him. James—who ran more slowly due to a pronounced limp—chased him as well. As Benitez and defendant rounded the end of the fence, defendant fired another shot. James immediately turned around and began to run back along the fence to his car when he heard a third shot. After firing the third shot, defendant also ran and caught up to James. Together they ran back to James's car (James: 1764-68, 2051-57).

Meanwhile, as Jose Rosales waited in his car for Benitez (his cousin) to return, he heard a shot and he heard Benitez scream out "cousin." Rosales got out of his car and heard two additional shots. He saw his cousin staggering toward him, clutching at his abdomen, and two males running away. One male was standing closer to his cousin in front of the white fence on the side of his apartment building. The man turned and started running away in the direction of the bodega. He wore a dark jacket with a hood covering his head, and blue or black jeans. Rosales saw only his back. Rosales saw the shadow of the second man who was standing next to, and slightly behind, the same white fence. That man also left in the direction of the bodega. Rosales ran toward his cousin and placed him on the ground. Benitez's eyes were open, but he did not move. The police and ambulance arrived within five minutes (Rosales: 1026-43).

Shortly after defendant and James left the bodega, Syed Raza, who was still standing outside the bodega, saw police cars racing down Hendrickson in the same direction in which defendant had walked (Raza: 961-62). Hempstead Police Officer Louis Rodriguez arrived at

4

**ATTACHMENT 2**

the scene and immediately called for an ambulance (Rodriguez: 701-02, 709).  Ambulance Medical Technician Daniel O'Keefe arrived at the scene and observed Benitez had a gunshot hole to the middle of his chest.  He was unresponsive and his pupils were fixed and dilated, indicating that he had no brain activity.  O'Keefe tried unsuccessfully for seven to ten minutes to revive Benitez, and then transported him to Mercy Medical Center, where he was pronounced dead (O'Keefe: 739-44).  During a subsequent autopsy, Doctor Gerard Catanese of the Medical Examiner's office, removed a .32 caliber bullet from Jose Benitez's chest.  The bullet was turned over to detectives (Catanese: 1215).

Jose Palacious, who lived in a first-floor apartment at 60 Hendrickson Avenue, was asleep on his couch when he heard a shot and a scream, followed by two more shots.  He looked out his front window, which faced the front of the building, and saw a man, wearing all black, with a black hood on, standing by the end of the white fence located just to the side of the building.  The man's back was to Palacious, so he was unable to see his face, and almost as soon as Palacious saw him, he turned the corner by the fence. Palacious called 911 (Palacious: 1017-22).

Marjorie Dunn was in her second-floor apartment at 6 Devon Road at about 6:30 a.m. when she heard gunshots.  She looked out of her window onto Devon Road and observed a man running east on Devon Road.  The man was wearing blue jeans and a dark hooded jacket with a hood over his head.  The man was running with no discernable limp or disability (Dunn: 1346-52).

Bernice Jones was asleep in her third-floor apartment located directly across the street from 60 Hendrickson Street.  She was awakened by a shot at around 6:30 a.m.  She looked out

**ATTACHMENT 2**

her window and observed a male walking down Hendrickson, toward Fulton Avenue. She saw only the man's back, but she clearly observed that he walked with a limp. He wore what appeared to be a black hooded jacket, baggy pants, and white sneakers (1154-69, 1191-92).

Crime Scene Search Section detectives arrived at the scene. Although they documented the crime scene, they were unable to find any ballistic evidence such as shell casings, bullets, or a gun (Rinaldi: 748-49, 753).

Homicide Detective Carl Re, together with Electronics Squad Detective Jose Lore downloaded the video from the video surveillance recorders which faced the front door of the bodega, and another which recorded activity in the bodega for the period covering from 3:00 a.m. to 7:00 a.m. on the day of the murder (Re: 1298; Lore: 1111-12).

On April 16, 2006—six months after the murder of Benitez—Hempstead Village Lieutenant Joseph Sortino responded to a radio call reporting shots fired. He arrived at the scene and observed an individual—later identified as Shante Blanton—laying in the street, suffering from an apparent gunshot wound. After speaking with several individuals at the scene, Sortino went to the home of Keith James and placed him under arrest in connection with the shooting. James was cooperative with police and told them that the gun used in the shooting was hidden in the furnace of his home. He also advised them that the same weapon was used in the shooting of Jose Benitez six months earlier, when he and defendant attempted to rob Benitez. The gun was recovered from James's house (Sortino: 1263-57; Re: 1308-09; James: 1790).

**ATTACHMENT 2**

A comparison of the gun found in James's home and the bullet that was recovered during the autopsy of Jose Benitez, revealed that the bullet removed from Benitez was fired from the gun that was recovered from Keith James's home (Nemeth: 1241).

On April 21, 2006. defendant was arrested and transported to the Homicide Squad. After waiving his *Miranda* rights, defendant proceeded to answer questions by Detective Re. Defendant initially claimed that he was merely a witness to the events surrounding the murder of Benitez. He claimed that he was standing across the street from the bodega when he saw Keith and Cordell James driving in Keith's car. He said that they pulled up to the bodega and Cordell got out of the car and walked down Hendrickson Street while Keith circled around the block in his car. Then, defendant claimed, he heard shots (Re: 1313-26). After continued questioning, defendant admitted that it was he, not Cordell James, who was involved in the robbery and murder that night (Re: 1341).

Defendant gave a written statement in which he admitted that he was driving around with Keith James that night. He claimed that James—not defendant—had the revolver, and that it was James who began to talk about robbing someone because he had no money. According to defendant, they parked on Devon Avenue, several blocks from the bodega, they both got out of the car, and they began walking down Hendrickson in the direction of the bodega. Keith had the gun in the inside left pocket of his jacket. According to defendant, "We were looking for anyone that we could rob so we could get money to eat." They saw a "poppy" (a male Hispanic) walking behind them. James started to chase the man, took out his gun, and fired five times at the man. Defendant claimed that he grabbed James's arm in an attempt to grab the gun, at which time one of the rounds grazed defendant's right forearm.

7

**ATTACHMENT 2**

The man they were chasing continued running, and defendant and James ran back to the car. They drove to James's house and hid the gun alongside the house under the porch. Defendant then drove to his grandmother's house and told his grandmother that he hurt his arm attempting to jump over a fence. His grandmother took him to the hospital, where he received six stitches in his arm. Detective Re was unable to verify this part of defendant's story with either defendant's grandmother or by reference to hospital records (Re: 1343). (A copy of defendant's written statement is attached hereto as Exhibit A.)

Keith James testified that he first met defendant when he (James) was fifteen years old. The two had been close friends ever since that time (James: 1748). On October 22, 2005, James was driving around with defendant, who was in the passenger seat. Defendant was carrying a gun that he had borrowed from James two weeks prior. They drove to the Stop and Shop bodega and stopped in front of the store. Syed Raza, the store's clerk, came out of the store, up to the car, and began speaking with James. Defendant got out of the car and nodded his head to signal to James that he had seen a "Jookz" (someone he wanted to rob). Defendant began following the victim around the corner on foot as James drove around the corner in the opposite direction to meet up with defendant. James drove one block south to Devon Street. He parked the car near the corner of Hendrickson, where he saw defendant struggling with Benitez. James got out of his car and ran over to help defendant, who was struggling with Benitez in front of a white fence. As James approached, he heard a shot, and he heard Benitez scream. Benitez began to run, and defendant and James ran after him. As Benitez and defendant rounded the end of the fence, defendant fired another shot. James turned around and began to run back toward his car. As he was running, he heard a third

8

**ATTACHMENT 2**

shot. Defendant, who ran faster than James due to the fact that James ran with a limp,[2] caught up with James and they both ran to the car. James took the gun from defendant and dropped defendant at defendant's grandmother's house. He then drove to his girlfriend's house. The next day, James returned to his home, flushed the shells down the toilet, and hid the gun in his house (James: 1762-71, 2051).

On April 16, 2008, James was being chased by Shante Blanton, (the husband of a woman James was seeing) and Blanton's friends. James ran to his house and his father came out to assist him, at which point Blanton and his friends began jumping and hitting his father. James ran into the house, got his gun, and fired several shots, at least one of which hit Blanton. James told his mother to call the police, and while waiting for police to come, he threw the shells in the toilet and the gun in the furnace. The police arrived and arrested him. He gave police permission to retrieve the gun from the furnace and told them that the gun had been used in the Benitez shooting (James: 1773-90).

The statement James made to the police regarding the Shante Blanton shooting was suppressed following a pretrial hearing in connection with the charges arising from that crime (James: 1796). Additionally, Shante Blanton was uncooperative and refused to testify. As a result, James was able to negotiate a plea agreement wherein he pled guilty to two counts of possession of a weapon in satisfaction of the charges arising from both the Blanton shooting

---

[2] James was involved in a car accident in 1998. He broke both legs. As a result, he had a rod in his left leg and his right toes were paralyzed, which caused him to walk with a pronounced limp (James: 1749-51).

**ATTACHMENT 2**

and the Benitez murder and agreed to testify against defendant.  He was sentenced to prison terms aggregating seven years (James: 1797-98).

### The Defense

The defense presented no evidence.

### The Verdict and Sentence

Defendant was convicted of murder in the second degree, attempted robbery in the first degree, and attempted robbery in the second degree.  He was acquitted of criminal possession of a weapon in the second and third degrees (2264).  He was sentenced to an indeterminate term of twenty-five years' to life imprisonment for his conviction of murder in the second degree, a determinate term of fifteen years' imprisonment and five years' post-release supervision for his conviction of attempted robbery in the first degree, and a determinate term of seven years' imprisonment and five years' post-release supervision for his conviction of attempted robbery in the second degree, all of which were ordered to run concurrently  (Sentence Minutes: 20-21).

**ATTACHMENT 2**

<u>ARGUMENT</u>

<u>POINT I</u>

Because Defendant Was Convicted At Trial Upon Legally Sufficient Evidence, This Court May Not Entertain His Claims Pertaining To The Sufficiency Of The Evidence Before The Grand Jury. His Claims Are, Moveover, Procedurally Barred, And Meritless.

Defendant contends that the grand jury proceeding was defective for a variety of reasons. The majority of his complaints focus on the sufficiency of the evidence. Specifically, he argues that the evidence established only his mere presence at the crime scene and that there was no evidence to establish that he participated in the crime or that he actually shot Benitez. He contends that the only evidence of his participation came from the uncorroborated statement of his codefendant and because he argues that the only two witnesses who provided any corroboration—Caesar Jiminez and Detective Re—testified falsely (*see* defendant's brief at 31-35, 53).

It is well-settled law that a defendant is precluded from challenging the sufficiency of the evidence before the Grand Jury after having been convicted at trial upon legally sufficient evidence. *See* C.P.L. § 210.30(6); *People v. Molina*, 188 A.D.3d 920, 923 (2d Dept. 2020). The Appellate division has already affirmed that defendant's guilt was proven beyond a reasonable doubt at trial (*People v. White*, 73 A.D.3d 820, 821-22 [2d Dept. 2010]), and, therefore this Court should reject his claims pertaining to the sufficiency of the evidence before the grand jury. His contention that the indictment should have been dismissed because perjured testimony was submitted to the grand jury is also barred, since the judgment of conviction was based upon legally sufficient trial evidence. *See People v. Hayes*, 44 A.D.3d 683, 683–84 (2d Dept. 2007). *See also People v. Nealy*, 32 A.D.3d 400, 402 (2d Dept. 2006) ("defendant's contentions that the

11

<u>ATTACHMENT 2</u>

prosecutor knowingly allowed perjured testimony, permitted inadmissible hearsay, failed to present allegedly exculpatory information, and gave insufficient instructions to the grand jury, are not reviewable on appeal from a judgment of conviction that was based on legally sufficient trial evidence").

In support of his contention that a conviction after trial does not cure a defective grand jury proceeding, defendant cites *People v. Sayavong*, 83 N.Y.2d 702 (1994) (defendant's motion page 40). However, *Sayavong* did not deal with a conviction after trial. In *Sayavong*, defendant brought an order to show cause, arguing that the presence of a police detective, who was also a witness in the grand jury, during the recording of the grand jury testimony of three minor victims, violated the secrecy requirements of the grand jury. Thus, the proceeding was defective and warranted dismissal of the indictment. *Id.* at 707. There was no conviction after trial. More significantly, defendant's attack is on the sufficiency of the evidence before the grand jury. *Sayavong* had nothing to do with that issue, and it has no bearing here.

Moreover, defendant's claim is subject to a mandatory procedural bar pursuant to C.P.L. § 440.10(2)(c), because defendant failed to raise the claim on direct appeal despite the fact that it is reviewable from the record or could have been made part of the record for review on appeal. C.P.L. § 440.10 may not be used as "a substitute for direct appeal." *People v. Donovon*, 107 A.D.2d 433, 443 (2d Dept. 1985); *accord People v. Cooks*, 67 N.Y.2d 100, 103-04 (1986); *see also People v. Cuadrado*, 9 N.Y.3d 362, 365 (2007) (a defendant does not have a "constitutional right to attack his conviction collaterally," despite his failure to do so on direct appeal). C.P.L. § 440.10 provides for post-judgment review of claims that cannot be addressed

**ATTACHMENT 2**

on direct appeal, i.e., claims that cannot be determined from records and evidence that were before the trial court. *See* C.P.L. § 440.10(2)(a-c).

It is similarly well settled that a court must deny a motion to vacate a judgment of conviction when, "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to . . . raise such ground or issue upon an appeal actually perfected by him." C.P.L. § 440.10(2)(c ); *see People v. McKenzie,* 151 A.D.3d 1080, 1080 (2d Dept. 2017) (County Court was "required to deny" a 440.10 motion where contentions could have been raised on direct appeal). Therefore, this court must deny defendant's motion because sufficient facts appear on the record to have permitted review of the claim on direct appeal.  *See* C.P.L.  § 440.10(2)(b); *People v. Maldonado*, 34 A.D.3d 497, 498 (2d Dept. 2006) (finding that where record presents sufficient facts to raise claims on appeal, those claims could not properly be raised in a C.P.L.  § 440.10 motion).

Even if that were not the case, defendant's claim would still be subject to summary denial because defendant could have raised it in his previous C.P.L. Article 440 motion but did not.  *See* C.P.L. § 440.10(3)(b); *see also People v. Gonzales*, 195 A.D.3d 641, 642 (2d Dept. 2021).  Specifically, defendant filed a C.P.L. 440 motion in May 2009, in which he raised five claims.  He argued that false testimony was introduced at his trial; that his judgment of conviction was procured under duress, misrepresentation and fraud; and that he had newly discovered evidence—namely, three letters authored by Keith James that pertained to James's own conviction—that he claimed would have probably changed the result of defendant's trial.

13

**ATTACHMENT 2**

In a ten-page decision, the Supreme Court denied defendant's motion on both procedural grounds and on the merits (Ayres, J.).  Although defendant was in possession of the grand jury minutes at that time—having been provided to him as part of the People's *Rosario* material before the pretrial hearing and the trial—he raised no claims pertaining to the sufficiency of the evidence before the grand jury.  Moreover, although defendant wrote hundreds of letters and submitted a plethora of other motions to this Court and to the District Attorney's Office, this is the first time he has raised any issues pertaining to the grand jury proceedings.  Thus, defendant's motion should be denied pursuant to C.P.L. § 440.10(3)(b).

In addition, defendant's claim should be procedurally denied because, prior to defendant's trial, the County Court inspected the grand jury minutes in camera and found that the evidence presented to the grand jury was legally sufficient to support each of the crimes charged.  A court may summarily deny a motion to vacate a judgment when the "ground or issue raised upon the motion was previously determined on the merits upon a prior motion . . . unless since the time of such determination there has been a retroactively effective change in the law controlling such issue."  C.P.L. § 440.10(3)(b); *see People v. Huggins*, 130 A.D.3d 1069 (2d Dept. 2015) (upholding summary denial of vacatur motion that raised claims previously rejected in habeas proceeding); *People v. Medina*, 240 A.D.2d 202 (1st Dept. 1997) (upholding summary denial of vacatur motion where challenge to sufficiency of grand jury evidence was previously determined on the merits).

By stipulation, pursuant to C.P.L. § 210.30, the Court conducted an in-camera inspection of the grand jury minutes.  It denied dismissal of the indictment, finding that "the evidence before the Grand Jury is sufficient to support the charges in the indictment."

**ATTACHMENT 2**

*People v. White*, Ind. No. 1596N/06, Order (County Ct. Nassau County, October 16, 2006) (Brown, J.).  A copy of the order is attached hereto as Exhibit B.  The Court also determined that the Grand Jury proceeding was not defective, that proper legal advice and adequate instructions were given by the District Attorney, and that the indictment conforms to the requirements of C.P.L. § 200.50.  This decision is sufficient to permit this Court to deny defendant's argument as having been previously determined on the merits.  *See* C.P.L. § 440.10(3)(b).

Notwithstanding the procedural bars mentioned above, defendant's claims that the grand jury evidence was insufficient to sustain a valid indictment is without merit.  Defendant has attached a copy of the transcript of the Grand Jury proceeding to his motion (defendant's exhibit F).  As is clear from that transcript, the evidence established that on October 22, 2005, roughly fifteen minutes before the murder, Syed Raza, a cashier at Stop and Shop bodega located on Fulton Avenue at the corner of Hendrickson Avenue in Hempstead, New York, was leaving work when he observed the two defendants sitting in James's car just outside the bodega.  Raza previously knew both James and defendant and had seen James's car on many occasions.  Raza walked over to the car, at which time defendant, who had his hand inside his jacket, exited the car and began walking quickly toward Hendrickson Avenue.  Raza spoke with James for roughly five minutes and then went back into the store.  When he came out shortly thereafter, he saw James driving away toward Devon Road.

At roughly 6:30 a.m., Julio Jimenez was sitting in his car in a parking lot outside of his apartment building on Hendrickson Avenue, just off Devon Road, with his cousin Jose Benitez and his brother-in-law Jose Rosales.  Benitez left the car and walked down

15

**ATTACHMENT 2**

Hendrickson Avenue toward Fulton Avenue to the bodega to get some beer. About ten to fifteen minutes later, Jiminez heard shots and heard his cousin scream. He got out of the car and observed his cousin holding his hand to his chest and running down an alley which led back to the parking lot in which Jiminez was located. Jiminez saw two black men chasing Benitez and shooting at him. One of the bullets hit the dumpster which was right in front of Jiminez. He ducked down and when he got up again, he observed the two black men running away. Benitez continued to run toward Jiminez. Rosales ran toward Benitez as he was beginning to fall and laid him on the ground. Benitez later died as a result of a gunshot wound to the chest which perforated his heart and lung.

Bernice Jones was sleeping when she heard gunshots. She ran to her window which overlooked Hendrickson Street at which time she observed a person limping toward the street. The evidence established that Keith James had a pronounced limp. Majorie Dunn lived at 6 Devon Road on the corner of Hendrickson Avenue. At about 6:30 a.m. she heard shots and looked out of her window. She saw a black man running down Devon Road.

On April 16, 2006, Homicide Detective Carl Re arrested Keith James in connection with an unrelated murder. After waiving his *Miranda* rights, James gave a written statement to Re in which he admitted having committed the unrelated murder, and advised Re that the same gun used in the unrelated murder was also used in the murder of Benitez.

James told Re that he and defendant were sitting outside the Stop and Shop bodega. Defendant had a gun on him that he had borrowed from James the night before. A man that works at the bodega, whom James knew, came over to the car to talk to James, and defendant got out of the car. As he got out of the car, defendant told James to meet him around the

16

**ATTACHMENT 2**

corner, and nodded his head to indicate that he was going south on Hendrickson Street. James understood that this meant that defendant had found a Spanish man to rob and was going after him. After speaking with Raza, James drove one block south on the road parallel to Hendrickson to Devon Road where he saw defendant running toward his car. Defendant jumped into the car. He told James he tried to rob a "poppy" (i.e., a Spanish man), but the man put up a fight and he fired the gun at him three times. He showed James three used shells he held in his hand. James took the shells and the gun. When James got home, he flushed the shells down the toilet and hid the gun. The gun was recovered by police, and it was determined after testing that a bullet recovered during the autopsy of Benitez had been fired from the gun that had been recovered at James's house.

On April 21, 2006, Detective Re arrested defendant. After waiving his *Miranda* rights, defendant gave a written statement in which he admitted that he and James were looking to rob someone that night so they could get something to eat. They pulled to the front of the bodega and sat in the car. A man came up to the window and talked with James for about five minutes. They then drove off and parked on a side street. They got out of the car and walked down Devon Road toward Hendrickson Avenue toward the bodega. James had a gun in the inside left pocket of his jacket. They saw a "poppy" walking behind them. James started to chase the man, took out his gun, and fired five times at the man. Defendant grabbed James's arm to grab the gun while James was shooting and one of the rounds grazed defendant's right forearm. The man they were chasing continued running, and defendant and James ran back to the car.

**ATTACHMENT 2**

They drove to James's house and hid the gun alongside the house under the porch. James then drove defendant to his grandmother's house and told his grandmother that he hurt his arm attempting to jump over a fence. His grandmother took him to the hospital, where he received six stitches in his arm. Detective Re was unable to verify this part of defendant's story with either defendant's grandmother or by reference to hospital records. *See* Exhibit 2.

As defendant correctly states, C.P.L. § 60.22(1) provides that a defendant may not be convicted of an offense based solely upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of the offense. The accomplice corroboration requirement applies with equal force to grand jury proceedings. *People v. Cilento*, 2 N.Y.2d 55, 62-63 (1956); *People v. Amell*, 277 A.D.2d 1052 (4th Dept.2000). The corroborative evidence required for C.P.L. § 60.22(1) purposes need not establish all the elements of the offense. *People v. Breland*, 83 N.Y.2d 286, 292 (1994). "Seemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration." *Id.* at 292–93 (citations omitted). The accomplice corroboration rule requires only enough non-accomplice evidence to assure that the accomplice has offered credible probative evidence. *Id.* at 293. The "corroborative glue does not require independent proof of the elements of the crime to sustain a conviction; it just has to bind the accomplice evidence to the defendant." *Id.* The corroboration requirement is satisfied by evidence independent of the accomplice testimony "tending to connect the defendant with the commission" of the crime. C.P.L. § 60.22(1); *see People v Steinberg*, 79 NY2d 673, 683 (1992).

Here, the accomplice testimony was amply corroborated by the testimony of Detective Re that defendant, after being arrested, made statements in which he admitted being with the

18

**ATTACHMENT 2**

accomplice, and, although defendant sought to place blame on James for the actual shooting, he admitted that he and James were looking for someone to rob.  He also provided many of the same details provided by James, including the date, time and place, and the fact that a man who worked in the store came up to James's car window.  That evidence was sufficient to corroborate the testimony of the accomplice.  *See People v. Burgin*, 40 N.Y.2d 953 (1976) (accomplice testimony was amply corroborated by defendant's admissions that he was in the company of other participants in the crime when they were getting ready to commit the crime, and was also present at the scene when crime occurred; this fully satisfied requirement for other evidence tending to connect defendant with the commission of the crime); *People v. Fort*, 298 A.D.2d 858 (2d Dept. 858)  (testimony of accomplice "was more than amply corroborated by defendant's confession") (internal citations omitted).

James's statement was also corroborated by the testimony of Syed Raza, the bodega clerk, who observed defendant in the car with James, walked up to the car to talk to James, and saw defendant get out of the car and walk quickly toward Hendrickson Avenue.  These facts were entirely consistent with James's statement and confirmed the information contained in James's statement.  *See People v Comstock*, 266 AD2d 856 (4th Dept. 1999) (testimony of accomplice was sufficiently corroborated by testimony of accomplice's mother who placed defendant and accomplice near scene of the crime around the time of the crime and statement of defendant and defendant's wife that defendant was with accomplice all night).  *See also People v. Amell*, 277 A.D.2d 1052 (4th Dept. 2000) (accomplices' testimony in the grand jury was sufficiency corroborated by testimony of police officer that defendant admitted being with accomplice and giving accomplice a ride at the time the burglary was committed, as well as

19

**ATTACHMENT 2**

testimony of defendant's co-worker that prior to the burglary, defendant asked co-worker whether the victims were at home).

The evidence before the grand jury provided sufficient corroborating facts to satisfy C.P.L. § 60.22(1). Indeed, in affirming defendant's conviction, the Appellate Division determined that, at trial "there was ample evidence corroborating the codefendant's testimony, including eyewitness testimony placing the defendant at the scene of the crime, and the defendant's confession that he and the codefendant conspired to commit a robbery, he was aware that the codefendant had a gun, and he accompanied the codefendant as he ran after the victim." *People v. White*, 73 A.D.3d 820, 821 (2d Dept. 2010). The evidence at trial was essentially the same as that presented to the grand jury and there were no additional corroborative facts introduced at trial that were not before the grand jury.

Defendant also argues that there was insufficient corroboration of his statement before the grand jury. C.P.L. § 60.50 states that "a person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed." Here, in addition to testimony regarding defendant's admission, there was ample evidence that Benitez was murdered, including the confession of James, and the testimony offered by Jimenez, Detective Re, Dr. Andrew Wolodzko who conducted the autopsy, and Detective Sergeant Robert Nemeth who was present during the autopsy. *See People v. Velez*, 122 A.D.,2d 178 (2d Dept. 1986) ("corroboration of felony murder was adduced as the People produced a corpus delicti, i.e., that the deceased was a victim of homicide resulting from someone's criminality").

20

**ATTACHMENT 2**

The remainder of defendant's claims pertaining to the grand jury proceeding, including his claim that Detective Re and Caesar Jiminez testified falsely, are unsubstantiated and conclusory. Defendant has failed to meet his evidentiary burden of proof showing that the grand jury proceedings were improper. Defendant, not the People, bears the "burden of proving by a preponderance of the evidence every fact essential to support the motion." *People v. Cain*, 96 A.D.3d 1072, 1073, 744 (2d Dept. 2012); *see also* C.P.L. § 440.30(1)(a), (6). The Court should deny defendant's motion without conducting an evidentiary hearing because "the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts." C.P.L. § 440.30(4)(b-d ); *People v. Ozuna*, 7 N.Y.3d 913, 915 (2006); *People v. Khalapov*, 133 A.D.3d 618, 619 (2d Dept. 2015) (court properly denied 440 motion without a hearing because defendant's allegations were not supported by any other affidavit or evidence).

Defendant's claims that Detective Re and Cesear Jiminez testified falsely before the grand jury are insufficiently supported and meritless. First, defendant's claims are "based upon the existence or occurrence of facts" which are unaccompanied by any "sworn allegations substantiating or tending to substantiate all the essential facts." C.P.L. § 440.30(4)(b) ; *see People v. Session*, 34 N.Y.2d 254, 256 (1974) ("[I]t is not enough to make conclusory allegations of ultimate facts; supporting evidentiary facts must be provided."); *People v. Vasquez*, 134 A.D.3d 742, 744 (2d Dept. 2015) (failing to come forward with substantial allegations that raise issues of fact sufficient to challenge the "presumed validity" of a judgment should result in the denial of defendant's motion). The claims are also "made solely by the defendant" and "there is no reasonable possibility that such allegations [are] true."

21

**ATTACHMENT 2**

Of course, none of this need even be considered because, as addressed *supra*, defendant was convicted after a trial at which his guilt was established by legally sufficient evidence. His complaints about the grand jury are not reviewable. Defendant's claims should be denied under C.P.L. § 440.30(4)(d).

**ATTACHMENT 2**

<u>POINT II</u>

Defendant's Claims That The People Committed *Rosario* And *Brady* Violations, And That The Judgment Was Procured By Misrepresentation And Fraud Are Procedurally Barred And Without Merit.

As he did in his direct appeal, defendant again argues that the People failed to turn over a witness's statement which, he contends, constituted *Brady* and/or *Rosario* material. Although defendant fails to name the witness in this motion, he argued in his direct appeal that the People failed to turn over the statement of Marjorie Dunn. During cross-examination of Majorie Dunn, defense counsel claimed that he had never received the statement Dunn gave to police. The prosecutor stated that he had already provided counsel with a copy of the statement at the time of the pretrial hearing, that if he had failed to do so, it was unintentional, and he provided counsel with a new copy.

Defense counsel conceded that the prosecutor had turned over "everything [he] asked for, as well as things that he was not entitled to," and he disavowed any suggestion of deliberate prosecutorial misconduct. He continued to insist, however, that Dunn's statement was not included in the material previously disclosed, and he claimed that the failure to turn over the statement prejudiced defendant and he requested that the witness's testimony be stricken (1360). The court denied counsel's application, directed that the statement be produced to counsel, adjourned the trial until the following day, permitted defense counsel to immediately reopen his cross-examination of Dunn, and offered to give a curative instruction to the jury (1360-61). The following morning, although the record does not indicate that defense counsel requested a curative instruction, the judge advised the jury that counsel was "being permitted to reopen cross-examination due to the fact he was provided with a statement yesterday that

23

**ATTACHMENT 2**

he was previously unaware of" (1375).    Defense counsel thereafter continued cross-examination of the witness.

The Appellate Division held that the defendant "was not prejudiced by the prosecutor's late disclosure of [Dunn's] statement because, upon being informed of the error, the Supreme Court ordered the prosecutor to provide the statement, instructed the jury to disregard the witness's prior testimony, and gave the defense an opportunity to re-open cross-examination." *People v. White*, 73 A.D.3d 820 at 822.  Because this issue was previously decided on appeal, this Court must deny defendant's claim.  C.P.L. § 440.10(2)(a).

Defendant's attempt to apply the newly enacted discovery provisions and sanctions of C.P.L. Article 245 to his trial should be rejected because Article 245 is not retroactive.  *See People v. Galindo*, 38 N.Y.3d 199, 207 (2022); *People v. Gough*, 209 A.D.3d 667 (2d Dept. 2022). Moreover, although defendant argued in his federal habeas petition that Dunn's statement constituted *Brady* material, the Court ruled that even assuming, arguendo, that Dunn's statement was favorable to defendant for purposes of impeachment, "there is no reasonable probability that the prosecution's late disclosure of Dunn's statement affected the outcome of petitioner's case."  *White v. Rock*, 2013 WL 1767784 *34 (April 22, 2013).

Defendant's claim that the People coerced Keith James to testify falsely at his trial, or that Keith James allegedly recanted his trial testimony, was raised by defendant in his first 440 motion and denied by the Court.  Indeed, the Court found that none of the evidence submitted by defendant established that Keith James was going to, or did, testify falsely against defendant.  Thus, the Court found, the judgment of conviction "was not procured by duress, misrepresentation or fraud on the part of the Court or a prosecutor."  (440 Decision at

24

**ATTACHMENT 2**

page 6.)  Thus, this Court should now summarily deny defendant's claims pertaining to these issues.  *See* C.P.L. § 440.10(3)(b).  Likewise, the United States District Court ruled that there was no evidence that "any statements James made implicating [defendant] in the crimes with which he was charged were false," nor did defendant establish that the "prosecution knew or should have known that James's testimony was allegedly false, or that there is a reasonable probability that the outcome of the trial would have been different absent James's testimony." *White v. Rock*, 2013 WL 1767784 *32.  The Court further found that there was no evidence that James's testimony was false or that he was forced to testify falsely.  *Id.*  Thus, the federal District Court ruled that the motion court's rejection of defendant's prosecutorial-misconduct claims, "was not contrary to, or an unreasonable application of clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court," and the Court denied defendant's prosecutorial-misconduct claim.  *Id.*

Defendant's further claim that the People allegedly presented false testimony of various witnesses at trial should be denied.  Other than Keith James, defendant neglects to specify which witnesses allegedly presented false testimony at the trial, or what part of their testimony was allegedly false.  Nor, does defendant provide any sworn allegations of fact to substantiate his claim that false testimony was presented at his trial or that the prosecution actually knew of any witness's false testimony.  Therefore, defendant's claim should be denied pursuant to C.P.L. § 440.30(4)(b).

All of defendant's claims regarding prosecutorial misconduct should be denied since they were either previously decided on appeal (C.P.L. § 440.10(2)(a)), or were previously

**ATTACHMENT 2**

decided in his first 440 motion and his habeas petition (C.P.L. § 440.10(3)(b)), and because defendant has failed to provide sworn allegations of fact to substantiate his claims (C.P.L. § 440.30 (4)(b)), and, in any event, all of his claims are meritless.

26

**ATTACHMENT 2**

POINT III

<u>Defendant's Ineffective-Assistance Claims Are Procedurally Barred And Meritless.</u>

Defendant contends that he received ineffective assistance of trial counsel because counsel failed to: (1) move to dismiss the indictment based on Rosales's trial testimony; (2) make a motion relative to the People's alleged *Brady* and *Rosario* violations pertaining to the People's failure to notify defendant of Rosales's trial testimony until the time of trial; and, (3) move to dismiss the indictment based on the allegation that the People knowingly introduced false testimony to the grand jury (*see* defendant's motion at page 37). He further takes issue with his trial counsel's cross-examination of certain witnesses (*id.* at 69). Defendant also contends that his appellate counsel was ineffective because he failed to raise a claim on appeal that trial counsel was ineffective (*id.* at 68).

Defendant's claims are procedurally barred pursuant to C.P.L. § 440.10(3)(c), because defendant could have raised them in his previous C.P.L. § 440.10 motion but failed to do so. Moreover, this Court should summarily deny defendant's motion because his papers do not contain any sworn allegations substantiating or tending to substantiate all of the essential facts necessary to substantiate his claim. *See* C.P.L. § 440.30(4)(b). Indeed, defendant has failed to support his allegations with any affidavits or evidence.

Moreover, even if there were no procedural bar to review of this issue, defendant would still be entitled to no relief on his claims of ineffective assistance of counsel because those claims are meritless. Under the Federal standard for evaluating ineffective-assistance-of-counsel claims, defendant must show that "counsel's representation fell below an objective standard of reasonableness" and that there is a reasonable probability that, but for counsel's

27

**ATTACHMENT 2**

ineffectiveness, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Under the State Constitution, a defendant raising an ineffective-assistance claim must show that he was not afforded "meaningful representation." *People v. Benevento*, 91 N.Y.2d 708, 711, 713 (1998); *People v. Baldi*, 54 N.Y.2d 137, 147 (1981). Under the state standard, prejudice is still considered; however, the prejudice component here focuses on "the fairness of the process as a whole rather than its particular impact on the outcome of the case.'" *People v. Galan*, 116 A.D.3d 787, 789 (2d Dept 2014) (internal citations omitted). Defendant's claim fails under both standards.

In order to prevail on a claim of ineffective assistance of counsel, defendant must overcome the strong presumption that defense counsel rendered effective assistance. *People v. Ambers*, 261 N.Y.3d 313, 317 (2015); *People v. Ivanitsky*, 81 A.D.3d 976, 977 (2d Dept. 2011). Disagreements about trial tactics or strategy are insufficient to establish ineffective assistance of counsel and defendant must demonstrate "the absence of strategic or other legitimate explanations for counsel's alleged failure." *People v. Nicholson*, 26 N.Y.3d 813, 831 (2016) (citing *People v. Satterfield*, 66 N.Y.2d 796, 799-800 [1985]). And "[a]bsent such a showing, it [should] be presumed that counsel acted in a competent manner." *People v. Rivera*, 71 N.Y.2d 705, 709 (1988). Here, defendant did not, and cannot, establish that his counsel was ineffective based on defendant's allegations that the attorney failed to make certain motions, or that he failed to ask specific questions on cross-examination.

Defendant claims that counsel was ineffective for failing to move to dismiss the indictment on various grounds. However, counsel cannot be deemed ineffective for failing to make an argument or motion that has little or no chance of success. *People v. Stultz*, 2 N.Y.3d

28

**ATTACHMENT 2**

277, 287 (2004); *People v. Vinson*, 199 A.D.3d 942 (2d Dept. 2021) (citing *People v. Caban*, 5 N.Y.3d at 143, 152 [2011]).  As discussed in Points I and II, *supra*, defendant's claims that counsel should have moved to dismiss the indictment are meritless and thus would not have had any likelihood of success.

Defendant's claim that counsel should have asked specific questions of certain witnesses during cross-examination is insufficient to establish ineffective assistance of counsel. A showing of ineffective assistance requires more than "simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after trial." *People v. Flores*, 84 N.Y.2d 184, 187 (1994).

As the Appellate Division determined, the record in this case demonstrates that counsel's representation was effective. *People v. White*, 73 A.D.3d at 822.  Indeed, the record demonstrates that counsel's representation was competent, appropriate, and vigorous at all stages, and defendant has presented nothing to this Court to otherwise suggest that he was deprived of meaningful representation.

**ATTACHMENT 2**

<u>POINT IV</u>

<u>Defendant's Claim Regarding An Error In The People's Appellate Brief Is Not Encompassed Within The Provisions Of C.P.L. Article 440 and, In Any Event, Is Meritless.</u>

In its brief to the Appellate Division, the People recounted the evidence at the pretrial hearing.  The People wrote that Detective Re testified at the hearing that he was provided with information by Caesar Jiminez, the victim's cousin, who told Re that he heard shots and observed two men chasing Benitez, who was staggering toward him.  The People mistakenly wrote in a footnote that Caesar Jiminez was also known as Jose Rosales—who was another cousin of the victim and who was also with him that night.  Jiminez testified before the grand jury, but not at the trial.  Jose Rosales testified at the trial, but not before the grand jury.

After submitting its brief to the Appellate Division, the People realized that Rosales and Jiminez were two separate individuals.  In a letter to the Appellate Division, dated January 27, 2010—before the case was argued before, or decided by, the appellate court—the People notified the Court of its error and advised the Court that the People were mistaken in stating that Rosales and Jiminez were one in the same and clarified that they are two separate individuals.  Thereafter, on March 22, 2010, the case was argued before the Appellate Division and, in a decision dated May 4, 2010, the Court affirmed the judgment. *People v. White*, 73 A.D.3d 820 (2d Dept. 2010).

Having raised no complaint about any of this in the Appellate Division, defendant now argues that the People's error in its Appellate brief prejudiced him, and therefore entitles him to vacatur of his conviction (defendant's motion at pages 49-50, 63-67).  However, defendant

**ATTACHMENT 2**

fails to identify any section of C.P.L. Article 440 that would encompass an error in the appellate process, and, indeed, there is none.

Even if defendant's claim were reviewable under C.P.L. Article 440—which it is not—defendant would not be entitled to relief because this error, and its correction, had no bearing on defendant's guilt or innocence or on any issue he raised either on appeal or at trial. Therefore, defendant's claim should be rejected.

31

**ATTACHMENT 2**

<u>CONCLUSION</u>

<u>Defendant's Motion Should Be Summarily Denied.</u>

Dated:   Mineola, New York
         February 29, 2024

                                Respectfully submitted,

                                ANNE T. DONNELLY
                                District Attorney, Nassau County
                                262 Old Country Road
                                Mineola, New York 11501
                                (516) 571-3660

Judith R. Sternberg
Barbara Kornblau
  Assistant District Attorneys
      *of Counsel*

32

**ATTACHMENT 2**

# EXHIBIT A

**ATTACHMENT 2**

APR. 25. 2006   2:01PM   NCPD-HOMICIDE-SQD   NO. 403   P. 2   K 478-05
Page 1 of 6

Statement of John White _____ _____ April 23, 2006

My name is John White. My date of birth is 9/29/85. I reside at 108 Remsen Avenue Hempstead with my grandmother, brother and uncle. I attended Hempstead High School until 1996/1997.

I have been told by Detective Re that I have the right to remain silent and that any statements I make may be used against me in court. I have been told that I have the right to talk with a lawyer before answering any questions or to have a lawyer present at any time. Further, I have been advised that if I cannot afford to hire a lawyer, one will be furnished me and I have the right to keep silent until I have had the chance to talk with a lawyer.

I understand my rights and make the following statement freely and voluntarily. I am willing to give this statement without talking with a lawyer or having one present. About 3 weeks into October 2005, I believe it was a Friday night I was hanging out with Keith Jones, Cordell Jones. It was late at night. We started to hang out

Det Care- M 863.

Det. M/M/aln

**ATTACHMENT 2**

APR. 25. 2006  2:01PM  NCPD-HOMICIDE-SQD

No. 4036/4dP. 35

Page 2 of 5

4/22/06

at around 3 AM and we hung out for a couple of hours. We were driving around the area near the 600 Fulton building and the stop and shop next to it. Keith was driving his 2 door, white, Grand Prix, I was in the back seat and Cordell was in the front passenger. Keith was drinking a Budweiser and Cordell and I had Corona. We had bought 1-beer each at a bodega on Main Street earlier. Keith had his revolver handgun in the car because I saw him during the evening pulling it under the driver's seat.

A couple of weeks before this I was over at Keith's house at 19 Harriet. He posted and Keith was showing me the gun. It was black with a brown wooden handle. The cylinder that held the bullets kept coming off because a spring kept popping out. I think the gun held 4 or 5 bullets. I put the bullets back in the cylinder and put the gun back together.

Sometime around 6 AM on that same next day - SATURDAY we were stopped somewhere out ___

Det. W. Walsh #834

NO. 493 – P. 448 - 05
Page 3 of 6

4/22/06

near the Stop and Shop. We had been driving around for several hours looking for a guy that Cordell had a beef with. When we stopped at this time Cordell got out and went to the 600 Fulton Avenue building. When he didn't come back after 15 minutes, I got into the front seat of the Grand Prix. We drove down Henderson Ave and pulled into the Stop and Shop fire lane. We stayed in the car and Keith was talking to a guy that came up to the car.

Keith spoke to the guy for 5 minutes and then we drove off. We drove around for 5 or 10 minutes. We were talking in the car. Keith had no money and Keith started to talk about robbing someone. We parked on Cameron, a street near the Stop and Shop.

Keith had a Black Mountain Bear jacket that had all sorts of pockets on it. It also had a hood. He took the revolver out of the car and put it in a inside pocket on the left side. We walk down Devon Road toward Henderson Ave. We made a right

Det. W/ Afaley     X /s/     H.White

APR. 25, 2006  2:01PM    NCPD-HOMICIDE-SQD 5021

NO. 4954 -P. 5 7 8 - 05
Page 4 of 5

7/12/06

onto Henderson and were heading towards
the Stop and Shop. We were looking
for anyone that we could rob so we
could get money to eat.

As we were walking up Henderson,
Keith saw a "poppy", a male hispanic,
walking in back of us. He was walking
towards Front Street in the opposite
direction. Keith started to chase the
poppy who was now across Nevco
Road but still on Henderson. Keith
already had the gun out and started
to shoot the gun at the poppy. He
shot 5 times at the poppy as he
was closing him. The poppy was
running next to a fence.

(2)  I also saw Keith's left side. I grabbed
Keith's right arm that he had the gun
in with my left hand and I grabbed
the gun with my right hand. He was
shooting the gun as I grabbed him. The
first couple of bullets that he fired
were in the direction of the poppy and
the last rounds went towards the
street. One of the rounds hit me in
my right forearm. It did not go

Out _____ 5486                    X _____

Det. W. Allen #___  **ATTACHMENT 2**

AFR. 25. 2006  2:02PM    NCPD-HOMICIDE-3QD  5022    NO. 4035 ~ P. 88 8 - 05

Page 5 of 6

4/26/06

through my arm it just grazed it. The
poppy kept running south on Henderson.
Me and Keith started to run on
Devon Road towards Cameron. When
we got to the car, Keith got behind
the drivers seat and I got in the front
passenger seat. We drove down Fairview.
We drove to Keith's house. When we
got there Keith got out with the gun
and put it alongside his house by the
porch.

He also drove me to 188 Remsen
where my grandmother lives. I believe
it was still dark out. I went into the
house and I told my grandmother I was
running and had to jump, and that
I got my arm caught on a fence and
ripped my pocket. The blue jacket
I was wearing had a hole in the sleeve
from the bullet. I believe I put the
jacket in my livingroom closet where
I think it still is.

My grandmother, Jessie White put
a gauze bandage and ace bandage
on the wound because it was bleeding
so much.                          ~ Mr. ff ———— H. White

Det ————— SMB6

Det. W/ White  #826
**ATTACHMENT 2**

9/12/06

Later that day in the afternoon she drove me to the hospital, Nassau Medical Center. I told the nurse I ripped my arm on a fence. I gave them my right name and date of birth. They put 6 stitches in my arm and sent me home. Detective Re has written this statement for me. I have read it and it is the truth.

X Mr. John A. White

Det. Paul Re 5/155

Det. Rey McCaleb 3934

**ATTACHMENT 2**

# EXHIBIT B

**ATTACHMENT 2**

COUNTY COURT - NASSAU COUNTY

Present :                                                    Crim. Term: Part 5

    HON. JEFFREY S. BROWN
      County Court Judge

                                    Indictment #1596N/06

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK | Kathleen M. Rice<br>District Attorney<br>Nassau County<br>Mineola, NY 11501<br>By: ADA Kenneth St. Bernard |
| - against - | |
| JOHN WHITE,<br><br>        Defendant. | Jeffrey Groder,  Esq.<br>Attorney for Defendant<br>114 Old Country Road<br>Mineola, NY 11501 |

      Pursuant to stipulations in Lieu of Motions executed on August 22, 2006  between the District Attorney of Nassau County by Assistant District Attorney, Kenneth St. Bernard, and by the defendant's attorney, Jeffrey Groder, Esq., the court has inspected the Grand Jury minutes. Upon inspection, the court finds that, the evidence was legally sufficient.

      This Court  has  inspected  the Grand Jury minutes in camera and finds that it is not necessary to release the minutes or any portion thereof  to the defendant's attorney to assist the Court in making its determination. (C.P.L. Section 210.30[3]).

      Upon inspection of the Grand Jury minutes, this Court finds that the evidence before the Grand Jury was legally sufficient to support the crimes charged in the Indictment. (C.P.L. Section 210.30).

      Further, the Grand Jury proceeding was not defective; proper legal advice and adequate instructions were given by the District Attorney.  (C.P.L. Sections 210.35[5] and 190.25[6]).

**ATTACHMENT 2**

Finally, the Indictment conforms to the requirements of C.P.L. Section 200.50.

Accordingly, the application to dismiss or reduce the charges alleged in the Indictment are denied.

SO ORDERED.

· ENTER,

Dated: October 16, 2006

JEFFREY S. BROWN, J.C.C.

ENTERED
AND
FILED

OCT 1 7 2006

CLERK'S OFFICE
COUNTY COURT
NASSAU COUN

**ATTACHMENT 2**

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK)

                               ) ss.:

COUNTY OF NASSAU  )

       SUSAN BEALLIAS, being duly sworn, deposes and says that:

       Deponent is not a party to the action and is over eighteen years of age.

       On February 29, 2024, deponent served a copy of the within AFFIRMATION AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO VACATE JUDGMENT, upon defendant, JOHN WHITE, DIN 08-A-3366, Green Haven Correctional Facility, P.O. Box 4000, Stormville, New York  12582-4000, his/her last known addresses, by depositing a true copy of same enclosed in a postpaid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States post office department within the State of New York.

_Susan Beallias_

Susan Beallias

Sworn to before me this
29th day of February, 2024.

_Karen Brooks_

Notary Public
KAREN BROOKS
Notary Public, State of New York
No. 01BR4914089
Qualified in Nassau County
Commission Expires March 14, 2026

**ATTACHMENT 2**

**Ind. No. 1596N-2006**          **Hon. Terence P. Murphy**
**Court No. Ind. 70014-06**      **Returnable:  3/4/2024**
**Motion No. C-161**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**
--------------------------------------------------------------------------X

**THE PEOPLE OF THE STATE OF NEW YORK**


**— against –**


**JOHN WHITE,**

                                             **Defendant.**
--------------------------------------------------------------------------X

**AFFIRMATION AND MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S**
**SECOND MOTION TO VACATE JUDGMENT**
--------------------------------------------------------------------------X


**ANNE T. DONNELLY**
**District Attorney, Nassau County**
**262 Old Country Road**
**Mineola, New York  11501**
**516-571-3660**


# ATTACHMENT 2